# ALBERT J. BOYLE ET AL.

## *vs.*

# W. WHITRIDGE RIDER.

*Creditors' Agreement—Mistake—Reservation of Priority—
Trustees—Personal Liability—Creation of
Debts—Intention.*

A creditor of a firm, who signed an agreement with other creditors, cannot repudiate the agreement on the ground that he failed to read it, even though he was misled as to the contents of the agreement by what was told him, especially after the other creditors, and those named as trustees in the agreement, had acted on the assumption that his signature was valid.                                                        p. 291

A creditors' agreement cannot be repudiated by one of the signers merely because a creditor bank, which signed it later, did so with an express reservation of its claim of priority under certain assignments from the debtor, it appearing that the creditor who was seeking to repudiate it knew when he signed it of the bank's prior claim, and also that, although he himself was a preferred creditor as holder of a bill of sale of certain property of the debtor, he made no mention thereof to the other creditors.                                                        p. 292

Trustees appointed by the court, in accordance with a creditors' agreement, to finish certain contracts undertaken by the debtor, with the expectation of realizing something for the creditors, such trustees being officers of creditor corporations, *held* not personally liable for supplies purchased by them in the administration of the trust from one of the creditors who had signed the agreement, he apparently giving credit to the estate rather than to the trustees individually, and the circumstances indicating that the parties to the agreement did not intend any personal liability on the part of the trustees.      pp. 293-297

The creditor's *secret intention* to hold the trustees personally liable, not expressed for over two years after the indebtedness was incurred, *held* not sufficient to impose a personal

liability on the trustees, such creditor having signed the creditors' agreement in accordance with which the trustees were appointed, and having allowed them to proceed thereunder, and aided them in so doing by sales to them of supplies, without any suggestion that he was not properly a party to the agreement.                                                    p. 298

When the circumstances are such as clearly to indicate an intention, on the part of one selling materials to a trustee, to exclude the personal liability of the latter, an undisclosed intention on the part of the former, to hold the trustee personally liable, cannot be asserted or given effect.           pp. 299-301

*Decided March 17th, 1920.*

Appeal from the Baltimore City Court (DUFFY, J.).

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER and ADKINS, JJ., BURKE, J., by reason of his resignation not participating in the decision.

*Randolph Barton, Jr.,* with whom were *John C. Kump* and *O'Mara & Angelmeier* on the brief, for the appellants.

*A. Bernard Chancellor,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellee recovered a judgment against the three appellants, individually, for feed for livestock furnished them while they were acting as trustees for The Slack and Slack Company. That company had contracted with the City of Baltimore to build some sewers, and, having become financially embarrassed, made a deed of trust to Albert J. Boyle, one of the appellants, for the benefit of its creditors. A few days afterwards a meeting of the creditors was held, and Messrs. Kelly and Vervalen, with the consent of Mr. Boyle, were selected as co-trustees, subject to the approval of the Court having jurisdiction of the trust. An agreement dated the 12th of November, 1915, was entered into between the

creditors and Mr. Boyle and, although not very clearly
shown, we understand that all of the creditors signed it. The
appellee was one of the number, but as hereinafter mentioned
he testified that he did not read the agreement and that its
terms were misrepresented. It recited that it had been agreed
that Messrs. Kelly and Vervalen should be appointed co-
trustees; that part of the assets of the company consisted of
two unfinished contracts with the Mayor and City Council
of Baltimore, one of which being approximately 98 per cent.
and the other approximately 25 per cent. completed; that
three bonding companies were jointly responsible to the city
for the completion of the contracts and had the right to take
possession of the assets of The Slack and Slack Company,
pertaining to the contracts, and to complete the work, and
threatened to so enforce their rights; that it had been agreed,
subject to the approval of the creditors and of Circuit Court
No. 2 of Baltimore City, that if the appellants would give
their individual bond to said companies to protect them and
save them harmless, the bonding companies would accept it
and waive their right to complete the work, provided no cred-
itors of The Slack and Slack Company instituted bankruptcy
proceedings against it, and that the bonding companies be
reimbursed in full for their claims against that company for
premiums due on the bonds furnished by them to the city,
and for their Workmen's Compensation bond; that it was re-
ported to the creditors that if the bonding companies pro-
ceeded with the work the creditors would lose approximately
$20,000 in the way of profits lost by reason of the failure on
the part of the trustees to complete the work, "whereas, if
the trustees aforementioned are allowed to proceed with the
work in accordance with the above mentioned arrangement,
whatever profits might accrue by the doing of the balance of
the work would be applicable to the payment of the claims
of creditors of The Slack and Slack Company." It was also
agreed that the signing creditors did thereby signify their
acceptance of the terms mentioned, to the intent that upon

the giving of the bond referred to, "the said Albert J. Boyle, Samuel A. Vervalen and John J. Kelly, trustees shall be authorized to proceed with the administration of the trust created by the said deed of trust, and to finally settle and close all matters appertaining to the administration of the said The Slack and Slack Company, a body corporate." They further agreed not to petition, individually or jointly, to have The Slack and Slack Company adjudicated a bankrupt, and that the trustees were only to be allowed $3,000 commissions—$2,000 to Boyle, $1,000 to be divided between the other two, and $1,000 to be allowed as counsel fees to the attorneys for the trustees.

Over forty companies, firms and individuals signed the agreement (eighteen of them after the plaintiff), the bond was given by the appellants and they were authorized by the Court to proceed with the work. They finished the contracts and were paid by the city the balances due, but it turned out that there were creditors who had prior claims which the record shows were allowed by the Court, resulting in the trustees not having funds sufficient to pay in full the claims they contracted in finishing the work, after paying those allowed as priorities. The suit by the appellee was for a balance of $915.28, with interest, alleged to be due him for feed furnished the trustees for horses or mules held by them. The plaintiff was a creditor of the company for four or five thousand dollars (apparently exclusive of a claim for $2,000 secured by a bill of sale on horses and mules of the company), and the three companies represented by the appellants were also creditors to considerable amounts. It was understood that in completing the contracts the trustees should buy from the creditors of The Slack and Slack Company, which they did, and the companies represented by the appellants, as well as others, furnished materials, and there is still money due those companies for what they furnished the trustees, besides about $1,200.00 advanced by the appel-

lants themselves. Mr. Boyle testified that they finished the work and collected the money that was retained on the contracts, that "from time to time the Court passed orders for us to pay those preferred claims out of our money for bills that were contracted by The Slack and Slack Company before they appointed the trustees. Had that money not been paid preferred creditors, we would have been able to pay every cent that the trustees contracted for plus about fifteen thousand dollars on the original creditors' indebtedness." This is also in his testimony: "Did you or did you not know that those preferred claims were in existence? A. No, sir, lots of them I did not. Q. When did you find out? A. Not until the orders were passed; just about the time the work was completed, taking that money away from us, I did not know that the assignment and bills of sale existed." He was the original trustee and was the practical man in charge, but he said that there was no record of the preferred claims in The Slack and Slack Company's affairs.

It is admitted that there was no express agreement on the part of the appellee to look to the estate for what he sold the appellants beyond what may be inferred from the agreement of creditors referred to above, and he claims that his intention was to hold them individually for the amount of their purchases. The appellants, on the other hand, contend that the circumstances show that it was the intention · the appellee not to hold them personally responsible. Before considering the main question, it may be well to refer to the appellee's contention that he did not read the agreement of the creditors, which he signed and which he claims that Mr. Podlick, the attorney for the trustees, and Mr. Slack, who was with him, told him that it was "simply to keep the old Slack and Slack Company from being thrown into a receivership" —meaning bankruptcy, as his subsequent evidence shows. Mr. Podlick testified that he saw Mr. Rider twice about signing the agreement. At the first time he said he told him of the contents of the paper, what the creditors had agreed to

and passed it over to him and he read it; that he refused to
sign it the first time, saying that he wanted to think the mat-
ter over, that his claim was a large one.  He went again the
next day but Mr. Rider was not in and the following day he
signed it.   The appellee testified in reply that he could not
swear how many times Mr. Podlick called at his office, but
he only remembered one.   Mr. Podlick could have had no
possible reason for attempting to deceive Mr. Rider.  The
trustees had not then begun the work.   The agreement, out-
side of the signatures, occupies nearly two pages and a half
of the printed record, and we cannot understand how Mr.
Rider could have thought that it was only intended to pre-
vent the creditors from throwing The Slack and Slack Com-
pany into bankruptcy.   It was hoped by the creditors that
the plan proposed would result in not only paying expenses
which the trustees incurred in finishing the work, but in pay-
ing part of the claims of the general creditors.   The agree-
ment does refer to bankruptcy proceedings and even if Mr.
Rider misunderstood it and thought that was all it included,
he was bound to know what he was signing.   Even if he was
misled by what was told him, he was grossly negligent in sign-
ing the agreement without reading it, and there is nothing
in the record which excuses his negligence.   But beyond that,
there is not a particle of evidence to show that the trustees,
*or the other creditors,* knew that he had been misled into
signing the agreement.   On the contrary, he commenced at
once to sell the trustees, who were proceeding under that
agreement and the order of Court passed in pursuance of it.
As we have said in a number of cases, people cannot be thus
negligent, and as the result of their own carelessness sign
papers and then asks a Court to excuse them for their negli-
gence, especially if their action misled others.   Even illiterate
people cannot ordinarily so act, and receive the aid of the
Court, and the appellee is a business man of experience.
*Wilson* v. *Pritchett,* 99 Md. 583, 593; *Smith* v. *Humphreys,*
104 Md. 285, 290; *Paper Bag Co.* v. *Carr,* 116 Md. 541,

551, and other decisions show the position this Court has taken on that subject.

Another ground the appellee relies on to avoid the effect of the agreement is, that after he signed it, the National Marine Bank signed it upon an express stipulation that it was not to interfere with its claim of priority under assignments covering all the money due, or to become due by the city to The Slack and Slack Company. But he testified that he "knew there was not a large amount of money to be saved," that "Mr. Slack had endorsed all these balances due by the city on retainers, they had all gone to the National Marine Bank, because Slack told me the National Marine Bank held them all, there was no money there. That is the great proposition they were going to get some money out of." Yet he claims that he was so imposed on by the special agreement of the bank that it relieves him of any binding effect. If he knew it, as he swore several times he did, how could he have been injured by the special stipulation with the bank? In addition to that, he was himself a preferred creditor— had a bill of sale on some of the live stock, for which he furnished feed to the trustees, and was allowed priority for it, but he signed the agreement without making any note as to his priority, or telling the trustees or other creditors of it. Then he was asked: "Didn't you know perfectly well that they (the trustees) were completing contracts which Slack & Slack had in partial performance at the time that the failure occurred, and that there was a lot of withheld amounts which they were to get and would get payments of as this work progressed, and that they were completing these contracts with the idea of securing money to help pay the creditors?" And he answered: "I did, yes." So there is nothing in those contentions, and we must treat the agreement of creditors as his, as well as of the others who signed it, and give it such effect as it is entitled to.

The general principles are thoroughly established in this State as to the personal liability of trustees on contracts

made by them, but like most subjects the question generally
is as to the application of principles of law to the facts of
each particular case. The case of *Gill et al.* v. *Carmine,* 55
Md. 339, is not only a leading one in this State, but some
of the facts are similar to those in this case, although differ-
ent in some important respects. Michael Roche, a builder,
made a deed of trust to Gill and others of his property for
the benefit of his creditors. There were some unfinished
houses, the completion of which Roche said in his deed would
greatly increase his assets. Upon the petition of the appel-
lants as trustees, and at the instance of the creditors of
Roche, the Circuit Court passed an order authorizing the
trustee before making sale to complete seventeen unfinished
houses (including those upon which the appellee did the work
and for which he furnished the materials sued for), and to
pay for the same out of such amounts as might be received
from the trust estate. But as shown by the report of that
case the appellee looked to the appellants alone for the pay-
ment of his account, and *so told them before he finished the*
*work.*

Judge Alvey, after saying that "the law is perfectly well
settled, that the party holding the estate in trust, even with
general powers of management, is bound personally by the
contracts that he may make as trustee, though he designates
himself as such," and quoting from 1 *Parsons on Contracts*
(4th Ed.) 102, referred at length to the case of *New* v.
*Nicoll,* 73 N. Y. 127, where it was held that a trustee hold-
ing and managing a trust estate, who was authorized to make
an expenditure which was necessary for the protection, rep-
aration or safety of the trust estate, but had no trust funds,
and was not willing to make himself personally liable, could
by express agreement make the expenditure a charge upon
the trust estate, and have a lien upon it therefor, and could
transfer such lien to another party who would agree to make
the necessary expenditure, upon the faith of the trust estate.
He then went on to say: "But, in the absence of such ex-
press agreement, or circumstances plainly indicating an in-

tention on the part of the party doing the work or making the expenditure, to exclude the personal liability of the trustee, and to rely exclusively upon the estate, or some other source for payment, the trustee, at whose request the work was done or expenditure made, will be held personally liable. In such case, he must seek reimbursement from the trust estate."

In *Glenn* v. *Allison, Trustee,* 58 Md. 527, there was a covenant by John Glenn, in a mortgage made by him as trustee of Margaret Armstrong, and he was sued personally on the covenant. The Court, through JUDGE ROBINSON, after fully recognizing the general rule as to the personal liability of a trustee, said: "Where it plainly appears from the face of the instrument, that he did not mean to bind himself personally, courts will construe the covenant according to the plainly expressed intention of the parties, and this too, in cases where the covenantor had no right to bind himself in a fiduciary character." He said that if the question depended solely upon the covenant itself, there could be no doubt as to Glenn's personal liability: "But when the covenant is read in connection with the recitals in the mortgage which refer to the deed of trust, by which he was authorized to borrow the money, and the order of the Court having jurisdiction over the trust property, and to whom the trustee was answerable for its proper administration, it is clear that Glenn neither meant to make himself personally liable, nor was it so understood by the mortgagee * * *. We are of opinion, however, that *construing the mortgage according to the obvious meaning of the parties,* Glenn is not personally liable on the covenant." The Court reversed the judgment without awarding a new trial. In *Knipp* v. *Bagby,* 126 Md. 461, there was also a covenant in a mortgage made by a trustee. The Court held there that an examination of the mortgage, the dealings between the parties by letter and otherwise show that the mortgagee never intended to rely solely upon the mortgaged property as the only security for the debt, or that the *cestui que trust,* and not the trustee personally, should

be bound. A personal decree was entered against the appellant for a balance due after the foreclosure of the mortgage.

Those are the principal cases in this State on the liability of trustees on contracts made by them. Before passing on the prayers it will be well to see what, if any, circumstances there were that can be said to clearly indicate an intention on the part of Rider to exclude the personal liability of the trustees and to rely exclusively upon the estate. In the first place, the agreement of the creditors, while not in so many words stating that they were to look to the estate alone, and that the trustees were not to be held personally liable, *could not mean anything else,* when interpreted in the light of the surrounding circumstances. The trustees were respectively officers of three corporations which were creditors of the Slack & Slack Company. Boyle had already been named trustee in the deed of trust, and with his consent the other two were made co-trustees with him and the three were clearly understood to be the representatives of the creditors, subject to the supervision of the Court. It was reported to the creditors at the meeting held on November 12, 1915, that there were profits in sight, amounting approximately to $20,000, which others would make if the bonding companies prosecuted the work through subcontractors, whereas if the trustees proceeded with the work under that agreement, "whatever profits might accrue by the doing of the balance of the work would be applicable to the payment of the claims of creditors of The Slack & Slack Company." It was then agreed that upon the trustees giving the bond to the bonding companies, spoken of above, they "shall be authorized to proceed with the administration of the trust created by the said deed of trust, and to finally settle and close all matters appertaining to the administration of the said The Slack & Slack Company." It was bad faith, not to use a stronger term, for any creditor entering into that agreement to sign it with a reserved intention of holding the trustees personally responsible, if such conditions should arise as did actually arise—preferred claims having exhausted or depleted

the receipts of the trustees, so that they could not pay all of the obligations incurred by them in carrying out the agreement of the creditors—and not disclose such intention.   The plaintiff was one of the preferred creditors, and is now suing for feed purchased of him by the trustees, and it can be fairly inferred from what is in the record that at least part of it was used to feed the live stock on which he had a bill of sale, and which went into possession of the trustees and was sold by them—the appellee being allowed in the audit the proceeds of sale, $2,000, as stated in the record.

Then he commenced at once to sell feed to the trustees, the entries on his books were, "Trustees of The Slack & Slack Company," the statements sent by him showed the same debtors and the checks he received for payments were signed in the same way.   The names of the trustees did not appear on the books, or statements sent by the appellee.   The articles in his account were furnished by him in February, March and April, 1916, and on May 2, 1916, he wrote a letter addressed to "Trustees of Slack & Slack Co.," asking for a check to cover balance in full, if possible, and insisting upon settlement of the overdue balance of $672.76 immediately. On May 15th he wrote another letter, addressed the same way, and again asking for balance.   On May 16th the "Trustees for Slack and Slack" wrote to him, "Yours of 15th at hand, and we regret that at the present time we haven't sufficient funds to meet this bill, but after our next estimate, will be in a position to settle it."   On May 18th he acknowledged receipt of their letter of the 16th, "and note where you are unable at the present time to settle your account with me, also note where you will settle after your next estimate. Kindly advise me the date of the estimate, and how long after this date you will make settlement."   He knew perfectly well that they were referring to the estimate from the city for the work they were doing for the creditors, although he gave evasive answers about them, but he did not bring this suit until December 4, 1918.   Then for the first time the

names of the appellants appear, although he had been told by
Mr. Boyle in 1916 that they had no money with which to
pay the bills. He made out his claim against the estate and
filed it in the trust case. That is, of course, not conclusive,
it "was but a circumstance to be considered by the jury," as
said in *Gill* v. *Carmine,* but it was a stronger circumstance
in this case than in that, when we take into consideration the
agreement, the facts above stated, and that the appellee called
upon Mr. Boyle a number of times for money, but never
*hinted* that he intended to hold him individually responsible,
*or that he had sold the articles with such intention,* and, as
we have seen, his books, his statements, his letters and his
agreement showed the contrary. The appellants would have
been foolish to have knowingly incurred such liability for
the creditors of The Slack and Slack Company, whom they
were representing, including the appellee, and while it is
true that they could have insisted upon an express agreement
that they should not be personally liable for purchases hon-
estly made in the progress of the work, it would not have
occurred to many, if any, business men that there could be
such liability, under the circumstances. If these trustees are
to be held personally responsible, it will be difficult in the
future to get responsible men to accept such positions, at the
instance of creditors. There was nothing to be hoped for by
The Slack and Slack Company, except to pay part of its debts
and, as we have already indicated, the creditors of that com-
pany were in effect the principals of the trustees, with the
permission and sanction of the Court. It must be borne in
mind that under the pleadings, and under the facts (as not-
withstanding repeated efforts to introduce matters which
were clearly inadmissible, and were calculated to prejudice
the appellants before the jury, the lower Court ruled them
out) there was no question of bad faith, or even improper or
negligent management or conduct of the business by the
trustees properly before the jury, or in the record. If there

had been, under appropriate pleadings, other questions might have arisen.

The important question as presented to us is, therefore, whether the Court should have granted the defendants' prayers seeking to take the case from the jury. It is not a case where the word "trustees," or even "trustees of The Slack and Slack Company" have been added to the names of those who were such. That might be "merely descriptive of these persons," as said in *Taylor* v. *Mayo, Admr.,* 110 U. S. 330, and quoted in *Knipp* v. *Bagby.* Nor can it be correctly said that as these trustees contracted, unless they are bound no one is bound, for they have no principal, as was said in *Taylor* v. *Mayo.* They were acting *for* the *creditors,* and were authorized by them to do just what they did do, and that was approved by the Court, and it was distinctly understood by the creditors, including the appellee, that they were to finish the *contracts in expectation of realizing something for those creditors,* who were not merely looking to an insolvent estate, but were trying through their appointees, the trustees, to save money for the estate, which would prevent it from being wholly insolvent. See a somewhat analogous case, as to whom credit was given, *Lumber Co.* v. *Israel Congregation,* 100 Md. 125, 127-128.

There is nothing to meet the overwhelmingly convincing evidence tending to relieve the defendants of personal liability, except the testimony of the appellee that he intended to hold them personally liable, an intention which was confessedly unexpressed and not even suggested, until he brought this suit, which was over two years and a half after the indebtedness was incurred, and after he knew he could expect but little, if any, more from the estate. The audits, orders of Court directing the trustees to pay the preferred claims, and the various proceedings taken by the appellee and others, are not fully set out in the record, and we have not the benefit of all information which copies of them might more fully give us, but as the appellee admittedly signed the agreement

of creditors and gave no notice to the appellants, or to the other creditors, of any mistake, fraud or misleading statements inducing him to sign it, and not only permitted the appellants to proceed under it and the sanction of the Court, but actually helped them to do so by selling to them materials required in their administration of the estate, he cannot now deny being a party to that agreement. That agreement, together with all he did and failed to do, which in fair dealing was his duty to do, cannot now be affected by a secret intention, any more than might have been, if he had signed a paper expressly relieving them of liability, and then at the trial sought to avoid its effect by something similar to what he says about this agreement, and his intention. He is estopped by his acts and conduct from now relying on such intention, confessedly known to himself *alone,* and contradicted by every movement he made and every step he took. If he had told the appellants of such intention, slumbering in his own mind, when they were purchasing of him, as Carmine did in *Gill* v. *Carmine,* they would doubtless have stopped buying from him, especially after the Court was passing orders to pay prior claims. But he testified that even his bookkeeper did not know what was in his mind. That was said in an attempted explanation as to why he billed the goods as he did.

The only question we have had any doubt about was whether the evidence of the appellee as to his intention required the Court to submit the case to the jury. There are decisions in this State which hold that it is permissible to allow a person to testify as to his intention in doing or not doing something involved in the trial. *Jarrell* v. *Young,* 105 Md 280, makes some of the distinctions as to when such evidence is admissible, and when it is not. The question there was whether there had been such an actual acceptance of goods by a purchaser, with intent to take possession *as owner,* as complied with the statute of frauds, and hence he was permitted to testify as to whether he intended to receive and

accept them *as owner*. That was held to be admissible, and in considering the subject the Court said: "It might be that a purchaser might do some act which would be conclusive of his intention, as to the question whether there has been such an acceptance and receipt as complies with the requirements of the Statute of Frauds. The Court could then instruct the jury that if they found that the purchaser had done such acts, the statute was complied with, and the mere fact that the purchaser would swear he did not intend thereby to become the owner of the goods would not relieve him." When there is no question about the facts (outside of what he said his intention was), and especially when they are admitted, as they were here, there could be no reason for submitting them to the jury. The Court cited some of our decisions to show what evidence was admissible and then referred to *Lineweaver* v. *Slagle,* 64 Md. 465, and *Ecker* v. *McAllister,* 45 Md. 290, as in a class of cases not in conflict with the general rule, where the evidence had been rejected. It quoted from *Lineweaver* v. *Slagle,* on page 490, that "Where the law imputes the intent from the acts done by a party, his testimony as to what his intention was in doing the act cannot be received in evidence." In *Ecker* v. *McAllister,* on page 309, it was said: "The intent with which a grantor executes a deed must be gathered from the deed itself, and from his acts and the surrounding circumstances. When the probable consequence of an act is to give a preference, the debtor will be conclusively presumed to have intended to give such preference. *Bump on Bankruptcy,* 404. Every person of sound mind is presumed to intend the necessary natural or legal consequences of his deliberate act. This legal presumption may be either conclusive or disputable, depending upon the nature of the act and the character of the intention. And when, by law, the consequences must necessarily follow the act done, the presumption is ordinarily conclusive, and cannot be rebutted by any evidence of a want of such intention. * * * When the result, which necessarily and inevitably fol-

lows the act, is to defeat the operation of the Bankrupt Act, the law conclusively presumes that the party intended to accomplish that result, and his denial of such intent is of no consequence.' " When the circumstances plainly and clearly indicate the intention on the part of one furnishing materials to exclude the personal liability of the trustee, and to rely exclusively upon the estate, the presumption that such was his intention must be held to be conclusive, *"and his denial of such intent is of no consequence."* It would encourage fraud to permit it to be done, and consequently, after a party has done enough, before and while the contract is being executed, to comply with what is necessary to relieve a trustee of personal liability, an undisclosed intention to hold him responsible, which he kept secret and hidden when it was his duty to make it known to the other party, cannot be asserted or given effect, so as to relieve him of the consequences of his acts and conduct, even if it be conceded that he had such concealed intention when he sold the materials. In view of that and what we have said above there was no legally sufficient evidence to entitle him to recover, and the trial Court should so have instructed the jury.

It follows that the defendant's first prayer and Kelly's prayer 1-A, Boyle's prayer 1-B and Vervalen's prayer 1-C should have been granted. It becomes unnecessary to discuss the other rulings, and the judgment must be reversed.

<div align="center">

*Judgment reversed, without awarding a new trial, the appellee to pay the costs.*