## GARDINER *v.* GARDINER
[No. 179, October Term, 1951.]

*Decided May 9, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Eldridge Hood Young*, with whom was *Harold M. Vick* on the brief, for appellant.

*James C. L. Anderson,* with whom was *Charles H. Cover,* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

On October 31, 1949, Ruth S. Gardiner, the appellant, filed a suit for divorce against her husband, Mac Gardiner, appellee, on the ground of adultery. She prayed a divorce a *vinculo matrimonii,* custody of the fifteen year old son of the parties, alimony *pendente lite,* permanent alimony, and general relief. After answer filed, a hearing was held on the alimony *pendente lite* on November 18, 1949, and the appellee was ordered to pay $50.00 per week. On December 11, 1950, the following order was filed in the case: "Mr. Clerk: Please enter the above entitled case 'Dismissed with prejudice.' Ruth S. Gardiner, Complainant."

On August 6, 1951, the appellant filed in the case a petition setting out the prior proceedings and the following:

"That on or about April 1, 1950 an agreement was entered into between the parties to this cause for settlement of property rights, but that the defendant, Mac Gardiner did not carry out and perform said agreement and thereafter on December 7, 1950 a supplemental agreement was entered into between the parties wherein your petitioner was informed and believed and therefore charges and avers that she was entitled to receive in addition to the property therein mentioned certain expenses and payments up to and including sixty days after December 7, 1950, and that the said defendant has failed and neglected to carry out said supplemental agreement. That your petitioner was informed that upon the execution of said supplemental agreement the bill of complaint for divorce was to be dismissed, but she was further informed that the cause or causes for divorce which she had against the said defend-

ant, she was entitled to retain, and your petitioner is now informed that said bill of complaint for divorce was dismissed 'with prejudice' against your petitioner, which order to dismiss was error, mistake and fraud upon your petitioner's rights in the premises. That your petitioner is advised and believes, and therefore charges and avers that she is entitled to have said order, dismissing said bill of complaint, stricken out, to the end and intent that she may retain all causes that she had for divorce against the said defendant, as set out in said bill of complaint herein, as also to have the said defendant carry out and perform his agreements and undertakings. Wherefore your petitioner prays that by order of this Court the order filed herein dismissing said bill of complaint 'with prejudice' may be recalled and stricken out and that the said defendant may be ordered and directed to carry out and perform his agreements and undertaking with respect to the property rights between your petitioner and her said husband, Mac Gardiner, the defendant. And that your petitioner may have such other and further relief as the nature of her cause may require."

The agreement of April 1, 1950, referred to in the petition, does not appear in the appendices. The supplemental agreement of December 7, 1950, provided that the husband deed to the wife his interest in property on Stevenson Lane, and that for $4,000.00 the wife deed to the husband her interest in property on Charles Street. The wife assumed all responsibility for her counsel fees. An answer was filed to that petition by the appellee on September 4, 1951, denying that he failed to carry out and perform said agreement and supplemental agreement but on the contrary alleging that he complied with these completely. Denying the material allegations of the petition, he asked that it

be dismissed. After a hearing before the chancellor in open court, an order was passed dismissing the appellant's petition of August 6, 1951, and from that order appellant appeals.

On the petition Ruth S. Gardiner testified that the divorce case had been set for trial for December 7, 1950. She was represented by Messrs. Stratford E. McKenrick and J. Elmer Weisheit, Jr. She came to Towson that day accompanied by her sister, Mrs. Shirely S. Garver, and her sister's friend, Mrs. Lawrence Kuszmaul, and arrived at her lawyer's office about 8:30 A.M. Mr. McKenrick left the office about 8:50 A.M., telling the appellant to wait there. She did not know where he had gone. Mr. Weisheit briefed her and her sister on court procedure. About 11 A.M. Mr. Weisheit said that he was going over to the office of Mr. Anderson, who represented the appellee, to see what was going on. Messrs. McKenrick and Weisheit returned to their office about 12:30 P.M. She testified further as follows: "Mr. McKenrick had his brief case in his hand, they both came up the steps. As they came in door Mr. McKenrick said, 'It is all settled the way you wanted it.' But he said, 'We had a terrible time with Mac Gardiner; he wouldn't go to court because the Judge doesn't like late cases.' He said, 'There are a few papers I want you to sign, Mrs. Gardiner.' At that time he asked me to come in his office. My sister and Mrs. Kuszmaul remained in the outer office. * * * Q. (Mr. Young) What was said when you went in the inner office? A. Mr. McKenrick and Mr. Weisheit both went in Mr. McKenrick's office. Mr. McKenrick proceeded to take all the papers out of his brief case. He was still standing at his desk. He said, 'I want you to sign these few papers.' I sat down, Mr. Weisheit pulled up his chair by my left and he said, 'Do you know what you are signing, Mrs. Gardiner? I said, 'If you two say it is all right then it is all right.' That is all that was said. Q. (The Court) You were following their advice? A. I certainly was. I had no idea. * * * No,

sir, I do not know what papers I signed and which and where I signed any of them. I know I signed them all in Mr. McKenrick's office. Q. Do you know how many papers you signed at that time? A. No, sir, I do not. Q. What was said after that? A. After I signed the papers Mr. McKenrick said, 'That will be all. You folks go out to lunch and come back after lunch. There will be some papers to sign.' After that he stands up and proceeds to leave the office with Mr. Weisheit. And I go out. We all go out to lunch." She and her sister returned from lunch in about an hour. Mr. McKenrick came back later with the remainder of the papers and said, "Here are some more things that have to be signed." She signed them and was told by Mr. McKenrick to return on December 11th for the check for $4,000.00, which was all he could get for her interest in the Charles Street property. She went back on December 12th and received a check for $2,947.45 which represented the $4,000.00 less certain expenses including court costs in the divorce case and counsel fee of $1,000.00. She went back to Mr. McKenrick's office later to get the papers she asked for on December 12, 1951. The papers had not been copied. Later she was allowed to take them home and she copied them herself in January, 1951.

The appellant further testified: "When I started I had them all spread on the dining room table. The first thing I noticed was this dismissal signed by me. It is my signature. But the dismissal said 'with prejudice' and I became very confused because we had never discussed a dismissal with prejudice. The only thing we had discussed was at Mr. Anderson's request. Mr. McKenrick told me my husband wanted me to dismiss the case on adultery and sue him for divorce on desertion. Mr. McKenrick said, 'In order to do that, if you decide to do it,' he said, 'but you will have to dismiss your first case and I would advise you to dismiss it with the words—'without prejudice'. He said, 'There are two ways to dismiss a case. If you dismiss it without prejudice then it means that should in any

later event my husband who has threatened to take my property I could always hold these adultery charges over his head and I could use them in my defense as a background. But if I dismissed the other way that that is the same as the Court dismissing the case. And he said, 'I wouldn't advise you to do that'. And I have never to this day said either way I would dismiss the case at all. It was purely a discussion that I dismiss the case and file for a divorce on desertion." She said she did not read the words "dismissed with prejudice" although it was in one line and her signature was directly under those words. She further said she would not have signed such an order because Mr. McKenrick had explained to her what such an order meant. On cross-examination she said that she knew on December 7, 1950, that Mr. McKenrick was trying to make a settlement. She discussed with Mr. Weisheit that morning how the divorce case would affect the son of the parties. She knew two or three months before that her husband did not want to have the adultery suit tried. She had discussed these matters with Messrs. McKenrick and Weisheit. She said, however, that she told Mr. McKenrick: "I am not interested in any financial settlement. I am not interested in being paid off. I am not interested in any money in this case. All I am interested in is getting a divorce on adultery in order to protect my honor." She admitted she had been a legal stenographer for former Governor William Preston Lane in his law office for four years, but said that he was a corporation lawyer. When asked the question whether she knew what the words "with prejudice" meant, she answered: "Yes, I knew what it meant". She admitted she had signed the order with those words in it, but did not read them. She said that although she signed the agreement she did not know what it contained until she read it at her home because she had not read it before. She said although she signed the deed she did not know what it contained. She further said the only thing she objected to now was the dismissal of the

case with prejudice. She said: "I don't want a dime out of this. But to protect my honor." She said she wanted a divorce for adultery rather than for desertion. She said she told Mr. McKenrick on February 24, 1951, that he "had messed the case up". "There is something wrong somewhere".

Mrs. Garver testified that on December 7, 1950, the appellant told Mr. Weisheit that she was interested in getting a divorce on the grounds of adultery because that would clear her. She said that when Mr. McKenrick returned to the office he said that he had everything ready and it would take only a few minutes to sign the papers and that the appellee "raved like a madman". She said: "I heard Mr. Weisheit say, 'Do you know what you are signing?' And I heard my sister say, Mr. McKenrick I didn't hear him say anything,—I could hear the papers rustling, a bunch of them, I heard my sister say, 'If you say it is all right, like I want, then it is.'"

The appellant relies on the case of *Williams v. Williams*, 63 Md. 371. In that case a son executed to his father a deed of certain property valued at some $250,000.00, on certain trusts declared in the deed. A bill was filed, after the marriage of the son, asking that the deed be set aside on the ground of the abuse of influence exercised by the father as the confidential legal adviser over the son, and that at the time of the execution of the deed the son was intoxicated. This Court there held that the deed should be set aside because: the son was weak, inexperienced, and a reckless spendthrift, acting under fear of a supposed danger; the relationship between the parties was highly confidential; and because the father was an able and experienced lawyer, although not influenced by mercenary motives. We see no similarity between that case and the one at bar. Also relied on by the appellant is the case of *Gross v. Stone*, 173 Md. 653, 197 A. 137. That case is not helpful here for the reason that the facts upon which a deed was

cancelled are entirely different from those before us here.

In *Boyle v. Rider,* 136 Md. 286, 110 A. 524, an attempt was made by the creditor of a firm to set aside an agreement with other creditors who had acted on an assumption that his signature was valid. This Court said in that case at page 291: "Even if he was misled by what was told him, he was grossly negligent in signing the agreement without reading it, and there is nothing in the record which excuses his negligence. But beyond that, there is not a particle of evidence to show that the trustees, *or the other creditors,* knew that he had been misled into signing the agreement. * * * As we have said in a number of cases, people cannot be thus negligent, and as the result of their own carelessness sign papers and then asks [sic.] a Court to excuse them for their negligence, especially if their actions misled others. Even illiterate people cannot ordinarily so act, and receive the aid of the Court, and the appellee is a business man of experience." In the case at bar there is no intimation that the appellant in the settlement of this case was in any way misled by the appellee or his attorneys. They relied on these papers signed by an intelligent woman. See also *Paper Bag Co. v. Carr,* 116 Md. 541, 550, 551, 82 A. 442.

The rule recognized by this Court is that parties of sound mind and under no legal disabilities, and not occupying fiduciary relations, are left free to make such contracts as to them seem wise. The courts will not reform or rescind such contracts without the consent of the parties, when there is no fraud, misrepresentation, mistake, undue influence, or fiduciary relation shown to exist, or unless the equities are such that they should not be enforced. This has been announced in a number of cases by this Court, among which are: *Shriver v. Druid Realty Company,* 149 Md. 385, 390, 131 A. 815; *Harrison v. Prentice,* 183 Md. 474, 482, 38 A. 2d 101; *Trotter v. Lewis,* 185 Md. 528, 533, 45 A. 2d 329. We are not passing upon any rights which might exist when

a party has been deceived by counsel, or someone occupying a fiduciary relationship, in a proceeding against such deceiver.

There is no testimony in this case concerning the carrying out of the agreements referred to in the petition. The $4,000.00 was certainly paid by the husband. The wife testified that she did not now object to any of the papers except the dismissal of the case "with prejudice". She admits that she had worked in a lawyer's office for four years previously; that Mr. McKenrick had explained to her the words "with prejudice"; that she signed the order dismissing the divorce case and that her signature appears directly under the words to which she now objects. The only excuse of this intelligent woman is that she did not look at and read these words. It appears that no fraud was practiced upon her and that the order, to which she objects, was explained to her. She admits she signed all these papers and now objects to only one. She admits that in January, 1951, she knew she had signed the order with the words to which she now objects. However, she waited for over six months to bring any legal action. We are of opinion that the order appealed from should be affirmed.

The effect of the words "dismissed with prejudice" is not before us in this case. In affirming the order appealed from, it is without prejudice to the rights of any of the parties here. We are not passing upon the validity, or construction, or what the words "dismissed with prejudice" stand for or mean. Also the effect of dismissing the case, without a previous order of court, is not before us in this case and we are not passing upon that question here.

*Order affirmed, with costs.*