Mary **HACKETT, Individually and as representative of a class et al., Plaintiffs,**

v.

**PENSION BENEFIT GUARANTY CORPORATION, Defendant.**

Civ. No. H–77–1564.

United States District Court, D. Maryland.

April 7, 1980.

Terrence M. Finn, Howard G. Goldberg and Smith, Somerville & Case and Raymond E. Callegary, Baltimore, Md., for plaintiffs.

James N. Dulcan, Asst. Gen. Counsel and Henry Rose, Gen. Counsel, Washington, D. C., for defendant.

ALEXANDER HARVEY, II, District Judge:

In this class action, plaintiffs are seeking a declaratory judgment which would require defendant to pay them pension benefits under the early retirement provisions of their former employer's pension plan. The plaintiffs here are former employees of Albert F. Goetze, Inc. (hereinafter "the Company"), which is now defunct and out of business. The defendant, Pension Benefit Guaranty Corporation (hereinafter "PBGC") is a federally chartered corporation which was introduced into the administration of private pension plans by the Employee Retirement Income Security Act of 1974 (commonly called ERISA).[1]

One of the primary purposes of defendant PBGC is to guarantee the timely and uninterrupted payment of pension benefits to employees who are entitled to those benefits from a private pension plan that has been prematurely terminated. 29 U.S.C. § 1302(a)(2). Defendant PBGC receives no appropriations of funds from Congress but is financed entirely by premiums paid by private pension plans, employer liability payments, assets of plans of which defendant is trustee, investment earnings and borrowed funds. 29 U.S.C. § 1305(b). Defendant PBGC has been directed by Congress to prescribe premium rates to be paid from private pension plans at the lowest level consistent with the performance of its obligations under ERISA. 29 U.S.C. § 1302(a)(3).

---

1. This statute was enacted as Public Law No. 93–406, effective September 2, 1974, and has been codified in part as 29 U.S.C. § 1001 *et seq.*

Particularly pertinent in this case is 29 U.S.C. § 1302.

On March 26, 1979, this Court certified the pending civil action as a class action. The class comprises all former employees of the Company (1) who were participants in the Albert F. Goetze, Inc. Local 117 Pension Plan (hereinafter the "Plan"); (2) who had attained 55 years of age prior to termination of the Plan; and (3) who are not presently receiving early retirement benefits from the defendant PBGC.[2] Defendant PBGC is the statutory successor to the rights and obligations of the Company under the Plan.

Presently before the Court are cross motions for summary judgment. As the essential facts are not in dispute, these pending motions present questions of law which may properly be decided under Rule 56, F.R. Civ.P.[3]

I

*The Facts*

The record in this case establishes the following undisputed facts. Prior to 1971, plaintiffs' Union negotiated a collective bargaining agreement with the Company which required the Company to contribute to a Pension Plan established for the benefit of its employees. The Plan later adopted in 1971 was funded by the Company through Aetna Life Insurance Company. This Plan created four different types of pensions: (1) a disability pension; (2) a normal retirement pension for those employees who retired on or after their sixty-fifth birthday; (3) an early retirement pension for those employees who retired with the consent of the Company on or after their fifty-fifth birthday; and (4) a deferred vested pension for those employees who terminated their employment with the Company after twenty years of credited service. Payments under the deferred vested pension would not be made until the employee reached age sixty-five.

The disability and normal retirement pensions provided for the payment to employees of full monthly benefits calculated at the rate of $5.50 multiplied by the number of years of credited service with the Company. The early retirement pension provided for the payment of full monthly benefits minus ½ of 1% times the number of months between the date the pension was to begin and the employee's sixty-fifth birthday. The deferred vested pension provided for the payment of monthly benefits equal to $2.00 multiplied by the number of years of credited service.

As early as 1972, the Company faced severe financial difficulties. Because of these continuing difficulties, the Company was not always able to pay Aetna Life Insurance Company the sums necessary to meet the funding requirements of the Plan. Whenever an employee sought to retire under provisions of the Plan, Aetna would demand that the Company make up any delinquent funding obligations before retirement benefits were paid to that employee. From time to time, between 1972 and 1974, delinquent obligations in amounts ranging from $2,000 to $10,000 were paid by the Company to Aetna, and these payments added to the Company's economic difficulties. In an attempt to relieve this financial burden, the Company and plaintiffs' Union, in May 1974, agreed that the Company might limit the number of early retirements to a reasonable amount.

In spite of continuing efforts to revive itself financially, the Company eventually failed, and in early August 1974, the Company filed a petition for voluntary bankruptcy. The period immediately preceding the filing of this petition was a time of great turmoil and uncertainty. The pressing need to prepare for the commencement of the bankruptcy proceedings took precedence over all other matters, including the

**2.** PBGC is currently paying early retirement benefits to 44 other former employees of the Company who are not members of the class because they have previously established their entitlement to benefits.

**3.** The parties have filed briefs, exhibits and affidavits in support of their respective mo-

tions, and oral argument has been heard in open court. Particularly pertinent to the issues in this case is the transcript of the deposition of Albert F. Goetze, Jr., who was the President of the Company and the Administrator of the Plan.

processing of numerous applications for early retirement which had been filed by employees in anticipation of the possible discontinuance of the Company's business. On August 8, 1974, the Company ceased its business operations, and no retirement applications were thereafter processed.

On August 23, 1974, Aetna informed the Company that if its delinquent obligations under the Plan were not paid by September 27, 1974, Aetna would terminate the Plan effective September 28, 1974. The payment demanded was never made, and the Plan was terminated on the latter date.

On September 15, 1974, Albert F. Goetze, Jr., the President of the Company, held a meeting with approximately sixty-five employees, including plaintiff Hackett and other members of the class.[4] At this meeting, Mr. Goetze outlined plans to reorganize the Company and requested the cooperation of the employees. Plaintiffs claim that Mr. Goetze promised that if the employees at the meeting would remain with the Company during its attempt at reorganization, they would receive full pension benefits.

Eventually, the company's attempts to reorganize its business failed, and on June 3, 1975 the Company finally was adjudicated a bankrupt. Subsequently, on April 6, 1976, defendant PBGC and the Company's trustee in bankruptcy agreed to terminate the Plan pursuant to 29 U.S.C. § 1342. The termination date of the Plan was fixed as September 28, 1974.

Between May 1974 and early August 1974, during the period when the Company's financial difficulties were most acute, plaintiff Hackett and a number of other members of the class requested that the Company give its consent for their early retirement under applicable provisions of the Plan. The record in this case does not indicate the exact number of plaintiffs who made such requests.[5] However, it is undisputed that the Company never acted on any of these requests, apparently because of the crush of other more pressing and more important matters which arose during this period of acute financial crisis immediately before the filing of bankruptcy. Thus, it is clear from the record here that the Company never gave its consent to the request for early retirement made by plaintiff Hackett or by any of the members of the class.

After defendant PBGC had assumed the Company's pension obligations under ERISA, plaintiffs requested that defendant pay them early retirement benefits under the Plan. Defendant refused to pay these benefits to plaintiff Hackett or to any of the members of the class on the ground that they were not qualified to receive any benefits pursuant to regulations duly adopted by defendant.[6] This civil action was then filed by plaintiffs.

## II

### The Issues

In support of its motion for summary judgment, defendant PBGC relies on 29 C.F.R. § 2605.5(a)(3), which states:

(a) A participant or his surviving beneficiary is entitled to a benefit if under the provisions of a plan:

\* \* \* \* \* \*

(3) Except for a benefit described in paragraph (a)(2) of this section, before the date of plan termination the participant had *satisfied the conditions of the plan necessary to establish the right to receive the benefit prior to such date other than application for the benefit, satisfaction of the waiting period described in the plan, or retirement.* (Emphasis added)

Defendant contends that plaintiffs have not satisfied the conditions of the Company's Plan which were necessary to establish their right to early retirement benefits be-

---

4. Although business operations had ceased, the employees returned to the Company premises to attend the meeting.

5. There are approximately 65 members of the class.

6. Pursuant to statutory authorization, PBGC has adopted regulations governing the exercise of its rights and powers under ERISA. 29 U.S.C. § 1302(b)(3).

cause they did not obtain the necessary consent of the Company prior to termination of the Plan.

In support of their motion for summary judgment, plaintiffs contend (1) that the consent of the Company was not a material condition precedent to the obtaining of early retirement benefits by an employee; (2) alternatively, that the Company consented to the early retirement of plaintiffs by virtue of the representations made at the meeting held on September 15, 1974; and (3) that this Court should in any event exercise its equitable powers to reform the Plan by deleting the requirement of Company consent.

For the reasons more fully discussed hereinafter, plaintiffs' motion for summary judgment will be denied, and defendant's motion for summary judgment will be granted.

## III

### Discussion

In 1947, a series of decisions of the National Labor Relations Board and of the courts held that under the National Labor Relations Act pensions and retirement plans were subjects of compulsory collective bargaining. See Inland Steel Co. v. NLRB, 170 F.2d 247 (7th Cir. 1948), cert. denied, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed.2d 1112 (1949). Since then, there has been a tremendous expansion of the number of employees covered by private pension plans. It was estimated in 1974 that over 30 million employees or almost one-half of the private non-farm labor force were covered by some type of pension plan. H.R.Rep. No. 93–533, 93d Cong., 2d Sess. reprinted in [1974] U.S.Code Cong. & Admin.News, pp. 4639, 4641.

Although private pension plans had been affected to some extent by federal labor legislation, Congress did not specifically regulate such plans until enactment of the Welfare and Pension Plans Disclosure Act of 1958, 29 U.S.C. § 301 et seq. After numerous instances of malfeasance and other improper acts on the part of pension administrators came to light, Congress amended that Act in 1962 and certain acts of administrators were designated as federal crimes when they occurred in connection with the administration of private pension plans. H.R.Rep. No. 93–533, supra at 4641. However, when the intermittent enforcement of the disclosure requirements of federal law and of the attendant criminal sanctions did not adequately protect employees' vested pension rights, Congress enacted ERISA in 1974 as a comprehensive regulation of private pension plans. H.R.Rep. No. 93–533, supra.

A major innovation added by ERISA to federal regulation of private pension plans was the establishment of a pension plan termination insurance program, to be administered by the Pension Benefit Guaranty Corporation, the defendant in this case. This program was the result of a federal study which indicated that over a period of twenty years some 250,000 employees could be expected to lose their vested pension benefits because of the premature termination of their pension plans. S.Rep. No. 93–383, 93d Cong., 2d Sess. reprinted in [1974] U.S.Code Cong. & Admin.News, p. 4890. To remedy this problem, Congress required all tax-qualified pension plans to participate in the insurance program. 29 U.S.C. § 1321(a).

Under regulations adopted by PBGC,[7] an employer's obligation to pay pension benefits under a particular plan is assumed by PBGC only if the employee in question was entitled to those benefits under the terms of the pension plan prior to its termination. Therefore, in order to determine whether the plaintiffs in this case are entitled to pension payments from defendant, this Court must consider the provisions of the Plan itself.

Section 7.05 of the Plan provides that its terms must be interpreted in accordance with the laws of the State of Maryland. Both federal and state law recognize that pension plans of the type involved in this case are contractual in nature

7. 29 C.F.R. § 2605.5(a).

and that they create rights which are enforceable by the employees. *See Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 245–46, 98 S.Ct. 2716, 2723–24, 57 L.Ed.2d 727 (1978); Ann. 42 A.L.R.2d 461, 467 (1954).

(a) *Was consent a material condition precedent?*

In support of their motion for summary judgment, plaintiffs first contend that the consent of the Company was not a material condition precedent to early retirement. Plaintiffs base this contention upon the fact that before it encountered financial difficulties, the Company routinely gave its consent for early retirement to those qualified employees who requested it. It is accordingly argued by the plaintiffs that the provisions of the Plan were modified by the Company's course of conduct so as to eliminate the express requirement that no one would be permitted to receive early retirement benefits without the consent of the Company. Plaintiffs rely in particular on statements made by Mr. Goetze during his deposition that he would normally consent to early retirement because he believed it was the right of the employee.

■ The Maryland courts have indeed recognized that the parties to a written contract may modify that contract at any time. *Hoffman v. Glock,* 20 Md.App. 284, 289, 315 A.2d 551 (Ct.Spec.App.1974). It is also accepted that a legally binding modification need not be in writing and may be proved by the subsequent conduct of the parties. *University National Bank v. Wolfe,* 279 Md. 512, 522, 369 A.2d 570 (1977). But these decisions also make it clear that whether a particular written contract has been modified depends upon the particular facts and circumstances of the case.

■ On the record, this Court finds and concludes that there was no modification of the Plan which resulted from conduct of the Company's representatives. The fact that on prior occasions before the summer of 1974 the Company had routinely given its consent to an employee's request for early retirement does not amount to a waiver of the consent requirement. Indeed, what the Company did was conduct completely consistent with the provisions of the Plan. Each employee continued to make the request (as did the plaintiffs here), thus recognizing that consent was still required. Had the Company intended to waive the consent requirements, it would have permitted its employees to retire early without going through the formalities of requesting and being granted consent. This was never done.

Clearly, it was discretionary on the part of the Company whether to grant or withhold its consent for early retirement.[8] The fact that consent was routinely given at some earlier date would not compel the Company to give consent at a later date, particularly when good reasons existed for the withholding of consent during the summer of 1974. This Court concludes that the Company's conduct in liberally exercising its discretion in favor of employees' requests prior to its financial difficulties is perfectly consistent with the provisions of the Plan, and cannot be construed as a waiver or modification of the requirement in all subsequent cases.

■ The statements of Mr. Goetze made during his deposition do not support plaintiffs' arguments. Throughout his deposition, he recognized that earlier requests were made and acted on but that plaintiffs' requests were not granted. His use of the words "employee's right" was no more than a loose characterization of his prior approach to requests for early retirement. He specifically stated that under his interpretation of the Plan, the Company would have the authority to deny a request for early retirement if a financial burden would result from simultaneous requests made by a large group of employees or if a key employee sought early retirement. (Deposition, pp. 21–22). Even if Mr. Goetze's statements are considered to be an interpretation of this written agreement by one of the parties, such interpretation is not bind-

---

**8.** Plaintiffs so concede in their brief.

ing upon the Court.[9] *See Sands v. Sands,* 252 Md. 137, 143, 249 A.2d 187 (1969).

The Plan, which became effective on February 1, 1971, was a detailed, carefully drawn, written document, some fifteen pages in length. A written "First Amendment" was executed by the Company on January 1, 1974. It is quite apparent that the Company and the Union hardly intended that a formal document of this sort could be modified in the informal manner claimed by the plaintiffs.

■ In any event, even if the Company did modify the Plan by any subsequent statements or conduct, any such modification would not be binding upon defendant PBGC. Defendant is a guarantor and the scope of its liability is determined by the contract of guaranty. 11 M.L.E. *Guaranty* § 5 (1961). If the guarantee modified the principal contract in a manner not provided for in the contract of guaranty and without the consent of the guarantor, then the guarantor is discharged from any liability attributable to the modification. *See Greenwell v. American Guaranty Corp.,* 262 Md. 102, 277 A.2d 70 (1971).

■ In this case, defendant's obligations are set forth in 29 U.S.C. §§ 1321 and 1322. The only pension plans covered by §§ 1321 and 1322 are tax-qualified plans, which must be written plans. 26 C.F.R. § 1.401–1(a)(2). Since ERISA provides plan termination insurance only for written plans, it follows that any modification to a covered plan must also be in writing. Otherwise, PBGC would never be able to assess its potential liability and undertake the financial studies necessary for the funding of its operations. Moreover, possibilities of abuse and fraud would exist if carefully drawn pension plans could be materially altered by oral statements or acts of the parties to the agreement. Accordingly, since the alleged modification of the Plan was not in writing, it would not in any event be binding upon defendant.

For these reasons, this Court concludes that the express terms of the Plan were not modified by conduct or statements of representatives of the Company subsequent to the date of the Plan. Therefore, before an employee would be entitled to receive early retirement benefits, consent of the Company was required. None of the plaintiffs in this case received such consent.

*(b) Did the Company consent?*

■ Little time need be devoted to plaintiffs' second contention that the Company in fact consented to early retirement of its employees at the meeting held on September 15, 1974. Plaintiffs rely solely upon the statement by the President that if the employees remained with the Company during its reorganization, they would receive full pension benefits.

In fact, the statement relied upon was the exact opposite of consent by the Company to early retirement. Mr. Goetze was attempting to persuade his employees to return to work and could hardly have been giving consent to their leaving. He wanted all employees to agree to continue to work for the Company during the period of financial crisis so that reorganization efforts might have a better chance of success. If he were giving his consent to early retirement at this meeting, some sixty-five employees (the very group which had been called back to be persuaded to return to work) would be leaving immediately and permanently. Thus, the Company's dire straits would be made worse, not better, if in fact the President was then consenting to early retirement by such a large group of employees.

■ The undisputed facts here disclose that the Company did not consent to the plaintiffs' request for early retirement, either at the meeting of September 15, 1974, or at any other time. Since plaintiffs had not satisfied the conditions of the Plan necessary to establish their right to receive

---

9. The Union clearly recognized that the Company could withhold consent. In its letter to Mr. Goetze dated May 31, 1974, the Union acknowledged that the Company could deny

early retirement if "the number of employees requesting same would seriously affect the ability of the Company to continue operations."

early retirement benefits before the date of the termination of the Plan, PBGC is not now obligated to pay those benefits.

### (c) Should the Court reform the Plan?

Plaintiffs' final contention is that this Court should exercise its equitable power and reform the Plan by deleting the requirement of consent.

 Under Maryland law, the power of a court of equity to reform a contract is an extraordinary one which must be carefully exercised, and reformation should be granted, only in a clear case. *Miller v. Stuart,* 107 Md. 23, 68 A. 273 (1907). This Court would not be empowered to reform the Plan merely because plaintiffs are dissatisfied with its provisions. *See Ray v. William G. Eurice & Bros.,* 201 Md. 115, 93 A.2d 272 (1953). To be entitled to reformation of this Plan, the plaintiffs must establish that the Plan as written was the result of fraud, misrepresentation, mistake or undue influence. *Gardiner v. Gardiner,* 200 Md. 233, 88 A.2d 481 (1952).

 On the record here, this Court does not find that plaintiffs have established any fraud, misrepresentation, mistake or undue influence on the part of the Company which would require reformation of the Plan. It is well settled that the consent of the employer is a valid condition precedent to the payment of early retirement benefits. *See Gallo v. Howard Stores Corp.,* 250 F.2d 37, 38 (3d Cir. 1957); *Norman v. Southern Bell Telephone & Telegraph Co.,* 322 S.W.2d 95 (Ky.1959). Concededly, the grant or refusal of consent to early retirement is discretionary with the employer. *Teren v. First National Bank,* 243 Or. 251, 412 P.2d 794 (1966); *Norman v. Southern Bell Telephone & Telegraph Co.,* supra. Normally, the employer's exercise of its discretion will not be disturbed by a court of equity. *Menke v. Thompson,* 140 F.2d 786 (8th Cir. 1944); Ann. 42 A.L.R.2d 461, 472–73 (1954). If, however, the employer withheld its consent in bad faith or in an arbitrary, capricious or discriminatory manner, then the condition of consent may be deemed to have been waived. *See Marsh v. Greyhound Lines, Inc.,* 488 F.2d

278, 280 (5th Cir. 1974); *Menke v. Thompson, supra* at 791; *Paterson v. Southwestern Bell Telephone Co.,* 411 F.Supp. 79, 86 (E.D.Okl.1976).

 Plaintiffs suggest that the equities here would support this Court's reforming the provisions of the Plan so as to permit them to receive early retirement benefits. They point out that it was the Company's financial crisis which caused the Company to stop giving its consent to employees' requests for early retirement, and they contend that such a decision was inequitable.

But what the Company did was in no way inequitable. Had the Company consented to requests for early retirement in May of 1974, bankruptcy would have resulted much earlier than it did because the Company would then have been required to make additional funding payments to Aetna. Rather than making payments which would benefit particular employees who sought to retire early, the Company decided to conserve its dwindling resources in an attempt to keep the business in operation for the benefit of all employees.

Moreover, it is clear that plaintiffs sought early retirement *because of* the Company's financial crisis. The class in this case includes some sixty-five former employees of the Company. There had never previously been so many requests for early retirement made by so many employees at one time. Quite obviously, the employees realized that the Company was going under, and they sought to gain as many benefits as they could before insolvency proceedings commenced. Just as they had the right to request early retirement in furtherance of their own financial interests, the Company had the right to refuse to give its consent in furtherance of the Company's financial interests. The Company's refusal to consent to these mass requests for early retirement did not constitute bad faith on its part, nor is there any evidence here of arbitrary, capricious or discriminatory action by the Company. Rather, what the Company did was a reasonable response to its precarious financial position at the time the requests were received. *See Jones v. Tallahassee,*

266 So.2d 382 (Fla.App.1972). Under all the circumstances here, this Court is satisfied that the equities do not support plaintiffs' request for reformation of the Plan.

It is further argued by the plaintiffs that this Court should reform the Plan because it was impossible to obtain the consent of the Company after it ceased business operations in 1975. Such a contention ignores the applicable regulations. Defendant PBGC is required to pay pension benefits only to those employees who qualified for them *before* the Plan was terminated. 29 C.F.R. § 2605.5(a)(3). Since the Plan was terminated effective September 28, 1974, and since defendant had no legal or other obligation to pay benefits to anyone whose right to receive them had not been established by that date, no reason has been presented for reformation of the Plan.

Finally, plaintiffs, relying on 29 C.F.R. § 2605.5(b), contend that defendant's own regulations allow it to amend the Plan to correct abuse of the consent provisions.[10] However, this regulation merely provides that if none of the conditions of § 2605.5(a) are met, PBGC will determine whether the participant is entitled to a benefit on the basis of the provisions of the Plan and the circumstances of the case. PBGC had already determined that plaintiffs are not entitled to benefits under this Plan. Section 2605.5(b) is inapplicable to plaintiffs' request for reformation of this Plan.

Since the undisputed facts establish that the Company did not consent to plaintiffs' early retirement and since the Company's actions were not arbitrary or undertaken in bad faith, this Court will not exercise its equitable powers and reform the Plan. Plaintiffs were simply not entitled under the facts here to receive early retirement benefits when the Plan was terminated.[11]

---

**10.** 29 C.F.R. § 2605.5(b) provides as follows: "(b) If none of the conditions set forth in paragraph (a) of this section is met, the PBGC will determine whether the participant is entitled to a benefit on the basis of the provisions of the plan and the circumstances of the case."

## IV

### *Conclusion*

For the reasons stated, plaintiffs' motion for summary judgment will be denied, and defendant's motion for summary judgment will be granted. An appropriate Order has been entered by the Court today.

---

**11.** Many plaintiffs will in any event be receiving other retirement benefits from PBGC. Those plaintiffs with 20 years of credited service are entitled under the Plan to a deferred vested pension, which PBGC is legally obligated to pay under 29 C.F.R. § 2605.5(a).