COLUMBIA PAPER BAG COMPANY OF BALTI-
MORE CITY *vs.* ALFRED J. CARR, CHARLES
E. COCKEY AND ROBERTSON GRIS-
WOLD, TRUSTEES.

*Sales in equity*: *duty of trustee; duty of purchaser, diligence;
caveat emptor. Exceptions; burden of proof;
excessive price; advertisement;
description.*

Trustees appointed by a decree of a Court of equity, to make
sales, are agents or instruments of the Court; sales made by
them are transactions between the Court and the purchasers,
and are regulated by the principles of equity applicable to
judicial sales.                                      pp. 543-544

Before ratification of a sale made by authority of a Court of
equity, all objections within these lines are open for con-
sideration, and the sale will be set aside upon proof of
error, mistake, misunderstanding or misrepresentation as to
the terms or manner of sale; and they must appear to be in
all respects fair and proper.                        p. 544

Only the interest or estate of the parties to the sale, however,
is sold, and the doctrine of *"caveat emptor"* applies to all
such cases.                                          p. 544

And judicial sales will not be set aside for causes that the par-
ties in question might, with a reasonable degree of diligence,
have obviated.                                       p. 544

A party can not have a contract set aside on the mere ground
that he neglected to read it, when he had a full opportunity
of doing so, provided that no fraud or material misrepre-
sensation or deception was practiced, under the influence of
which he was led to sign the contract.               p. 551

The caption to the advertised notice of a trustee's sale of certain real estate stated that the lot was at the southeast corner of Fort avenue and Laurence street, while in the body of the notice was stated that the beginning point of the description of the property was at the southeasternmost corner of Fort avenue and Laurence street as now *opened, dedicated and used.* This was held to be no misdescription, but to accord substantially with the exact situation and condition. p. 552

The burden of proof is upon an exceptant, to the ratification of the sale, to sustain his exceptions. p. 552

The mere fact that a purchaser pays too dear for the property at such a sale is not sufficient ground for setting the sale aside. p. 552

*Decided November 15th, 1911.*

Appeal from Circuit Court No. 2 of Baltimore City (STUMP, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*William E. Hoffman,* for the appellant.

*Charles A. Marshall* and *Edward N. Rich,* for the appellees.

BURKE, J., delivered the opinion of the Court.

By a decree of the Circuit Court No. 2 of Baltimore City, passed in the case of *Christina Kaiss and others* v. *Edwin C. Kaiss and others,* the fee simple property mentioned in the proceedings in that case was decreed to be sold, and the appellees on this record were appointed trustees to make the sale. They sold the property at public auction to the appellant, and reported the sale to the Court. An order of ratifi-

cation *nisi*. was passed, to which exceptions were filed by the purchaser. It also filed a petition asking for an abatement of the purchase price. Testimony on the exceptions and the petition was taken in open Court, which dismissed the petition for an abatement, overruled the exceptions, and ratified the sale. This appeal is taken from those orders.

The precise grounds upon which the appellant relies to vacate the sale are stated in the exceptions which are here transcribed:

First. Because the proceedings herein are irregular and insufficient, and not in accordance with the legal requirements for a sale of the property in these proceedings under the decree herein.

Second. Because the property advertised and sold hereunder, by the trustees herein, is not the same to be sold by them under the decree in these proceedings.

Third. Because the property advertised and reported as sold to this exceptant sets forth that the same runs along Lawrence street, and could be changed from its present use so as to have frontage on Lawrence street, when in fact it does not so run and said change could not be made.

Fourth. Because a strip of ground eighteen feet nine inches, lying between this property and Lawrence street was advertised and sold as being open and for public use, when in fact said strip is private property.

Fifth. Because the property in these proceedings to be sold under the said decree is of much less value and less desirable than the property advertised for sale and sold by said trustees as set forth in said report of sale.

Sixth. And for other reasons to be set forth at the hearing of these exceptions.

This Court has announced in many cases the principles which control it in passing upon exceptions to trustees sales. It is said in *Bolgiano* v. *Cooke,* 19 Md. 375: "Trustees appointed by decrees of a Court of equity, to sell real estate, are agents or instruments of the Court; sales made by them are transactions between the Court and the purchasers, and

as such, are regulated by all the principles of equity applicable to judicial sales. *Glenn* v. *Clapp,* 11 G. & J. 1; *Duvall* v. *Speed,* 1 M'd. Ch. 229; *Goldsborough* v. *Ringgold, Ib.* 239; *Perrin* v. *Keithley,* 9 Gill, 412.

Before the ratification of a sale made by authority of a Court of equity, all objections within these limits are open for consideration. The sale will be set aside upon proof of error, mistake, misunderstanding or misrepresentation as to the terms or manner of the sale; and it must appear to be in all respects fair and proper, or it can not receive the sanction of the Court. *Tomlinson* v. *McKaig,* 5 Gill, 276, 277.

The Court of Chancery, however, sells only the interest and estate of the parties to the cause, and the doctrine of *'caveat emptor'* applies to all such sales. *Farmer's Bank* v. *Martin,* 7 Md. 342. A purchaser discovering a defect of title, at a proper time, may be relieved from his purchase by asking a recission of the sale. *Duvall* v. *Speed,* 1 Md. Ch. 229; *Kauffman* v. *Walker,* 9 Md. 229. When a Court can see injustice will be inflicted by the ratification of a sale *upon a party not in default,* the sale should not be ratified. *Penn* v. *Brewer,* 12 G. & J. 113."

It is said in *Kaufman* v. *Walker, supra,* that "Judicial sales will not be set aside for causes that the parties in interest might, with a reasonable degree of diligence, have obviated. Every intendment will be made to support them. But where the Court can see that injustice will be inflicted by the ratification of a sale upon a party not in default, by reason of the carelessness or omission of its own officer, it should interfere to prevent it."

We will consider the questions raised on this record in the light of these authorities.

By deed dated August 15th, 1881, the Baltimore and Ohio Railroad Company acquired title to the lot of ground located at the southeast corner of Fort avenue and the east side of Lawrence street. This lot had a frontage of eighteen feet nine inches on the south side of Fort avenue, and ran par-

allel on the east side of Lawrence street for the distance of five hundred and ninety-five feet.

The railroad company appears to throw this strip open to public use. There are three railroad tracks on Lawrence street. The distance between the property sold and the east track is about twenty-eight feet, in which distance is included the eighteen feet nine inch strip acquired by the railroad company, the whole of which space is open and used by the public, and is apparently a part of the public highway, and has been so used, without obstruction or hindrance of any sought, for more than twenty years.

The property sold was formerly owned by W. C. Kaiss who died intestate in May, 1909. He acquired title to the property under a deed, which was filed as part of the bill in the above case, from John J. Myer, trustee, and others, dated June 6th, 1888.

This deed described the property as "being also at the distance of eighteen feet and nine inches southeasterly from the corner formed by the southwest side of Fort avenue and the southeast side of Lawrence street, and running then eastwardly binding on the southwest side of Fort avenue one hundred and fifteen feet and six inches, thence southwesterly at right angles to Fort avenue seven hundred and forty-five feet, more or less, to a point where formerly the middle of a creek or marsh, thence northerly binding along the middle of said creek and on ground formerly belonging to J. S. Gittings' estate, one hundred and seventy-five feet, three inches, more or less, to intersect a line drawn from the beginning southwesterly at right angles to Fort avenue, and thence reversing said line and binding thereon northeasterly six hundred and twenty feet, more or less, to the beginning." A diagram is here inserted which shows the location of the property.

The trustees offered the property for sale at public auction on the premises on November 1st, 1910, and at this sale the appellant, acting through its superintendant, John McIlvain, who was also one of its directors and authorized to bid, became the purchaser of the property for the sum of sixteen thousand, six hundred dollars. Immediately after the sale McIlvain signed a memorandum of purchase in these words:

BALTIMORE, November 1st, 1910.

I have this day purchased at public sale, for the sum of sixteen thousand and six hundred /00 dollars, upon the terms and conditions as announced by the auctioneer at said sale, viz: one-third cash, balance in 6 and 12 months, or all cash, at purchaser's option, the fee simple property known as S. E. Fort Ave. & Lawrence St., and more particularly described in the annexed advertisement.

J. McILVANE.

Witness:

SAM. W. PATTISON."

At the time of the sale this property was used as a coal yard, in which an extensive coal business had been conducted for a number of years. It was improved by a coal switch, and over head trestle, a large two-story brick stable, shedding, office building, and a sawmill. There was a board fence on the west side of the lot, along the eastermost line of the eighteen feet nine inch strip owned by the railroad. There was a gate way in this fence used by wagons going from the street to an from the coal yard. There is no dispute as to the situation and surrounding conditions at the time of the sale, and for many years prior thereto.

We find as a fact that there was attached to the contract or memorandum of purchase, above set out, at the time it was signed by John McIlvain the following advertisement of sale, being the one upon which the trustees had agreed, after careful consideration, contained an accurate and proper description of the property for the purposes of advertisement.

TRUSTEES' SALE OF VALUABLE FEE SIMPLE PROPERTY, SITUATE
18 FEET 9 INCHES EAST FROM THE CORNER OF
FORT AVENUE AND LAWRENCE STREET.

By virtue of a decree of the Circuit Court No. 2 of Baltimore City, the undersigned trustees will sell at public auction, on the premises, on Tuesday, the 1st day of November, 1910, at 3 o'clock P. M., all that valuable lot of ground in fee simple in Baltimore City, beginning on the southwest side of Fort Avenue 18 feet 9 inches southeast from the corner formed by the intersection of the southwest side of Fort Avenue and the southeast side of Lawrence Street, and thence southeasterly on the southwest side of Fort Avenue 115 feet, 6 inches; and running thence southwesterly at right angles with Fort Avenue 745 feet, more or less, to a point where was formerly a middle of a creek or marsh; and running thence northerly binding along the middle of said creek and on the ground formerly belonging to J. S. Gittings' estate 170 feet, 3 inches, to intersect a line drawn from the beginning at right angles with Fort Avenue; and thence reversing said line northeasterly 620 feet, more or less, to the place of beginning; the strip 18 rect 9 inches, lying between Lawrence Street and this property is

open and used by the public. Improved by a fine coal switch
and overhead trestle, running from the southernmost side of
the property towards Fort Avenue; large two-story brick stable,
shedding, office building and saw mill. This property has
been used for a very extensive coal business for a number of
years past by the late William C. Kaiss. It runs parallel 620
feet along Lawrence Street, along which street the tracks of the
B. & O. R. R. run, and could be readily changed from its
present use to the erection of warehouses fronting on Lawrence
Street, that could have introduced switches from the tracks of
the B. & O. R. R.

Terms of sale: One-third cash, balance in six and twelve
months, or all cash, at purchaser's option, deferred payments
to bear interest from date of sale, and to be secured to the
satisfaction of the trustees. Taxes and expenses adjusted to
day of sale.

A deposit of $500 required at the time of sale.

> ALFRED J. CARR,
> CHARLES E. COCKEY,
> ROBERTSON GRISWOLD,
>                        Trustees.
>
> PATTISON & GAHAN,
>                        Auctioneer.

This advertisement was published in the Baltimore Sun
beginning on the morning of October 18, 1910, and was
continued to the day of sale. It was also continued in the
Daily Record from October 15th, 1910, to the day of sale,
and it was the identical form of advertisement read by the
auctioneer at the time the property was offered for sale.

The following testimony of Mr. Carr gives a fair idea
of the situation and general condition surrounding the prop-
erty:

Q. State what is the appearance of the whole of the prop-
erty lying between the fence and the Baltimore and Ohio
tracks on Lawrence street? A. There is no difference
between the tracks and fence, it just forms one street bed
apparently. No one could tell where one began and the
other ended.

Q. Where what began? A. Where the street ended and where the strip began. Driving down they would drive partly on the strip and other times on the balance of it. One wagon passing another one would be partly on what would be the bed of the street and partly on the strip, and the other would be all on the strip. The other side of the track between that and the Division Glass Company property is in a little rougher condition and is little traveled on that side. Most of the travel is up and down the side between the tracks and the Kaiss property.

All the testimony shows that the whole strip is apparently a part of Lawrence street and that the property is located on the corner of that street and Fort avenue.

Upon these undisputed facts we are of opinion that there was no misdescription in the advertisement of the property under which it was sold. That advertisement was prepared by the trustees after careful consideration of the situation and the prevailing conditions, all of which were well known to John McIlvain. It embodies the description contained in the deed from John J. Myer, trustee, and others, to William C. Kaiss, and there was nothing in it calculated to mislead any man of ordinary care and prudence. It was certainly not calculated to mislead John J. McIlvain, who was thoroughly familiar with the property and the existing conditions.

We will now consider what took place on the day of sale. Mr. Samuel W. Pattison was the auctioneer who conducted the sale. He testified that he read the advertisement, and after reading it he asked whether any one wanted to ask any questions about the sale, but he could not recall whether any questions were asked at that time. He said: "I described the property from the advertisement as being 18 feet so many inches from the corner of Lawrence street, and at that time also made a statement that it was a valuable piece of property and no doubt it would become more valuable on account of the strip which was owned by the Balti-

more and Ohio Railroad which adjoins this property, and at some future day the Baltimore and Ohio Railroad might need this property, and it was an elegant opportunity for the purchaser to make a good investment. I made this statement before I asked for a bid."

Alexander McIlvain, one of the directors of the appellant company, and the father of John McIlvain, testified that he and John and another son, all of whom are directors of the appellant company, had a consulation, and concluded that they would bid on the property; that it was agreed that he was to bid to a certain sum, and that John was to use his own judgment after that; that he did bid, he thought twelve thousand dollars, and then stopped and that John then began to bid.

He testified that he did not think he had any conversation with his son at the time but might have shook his head at him and said he was bidding too much or something of that kind.

"I thought the lot was going too high. That was my impression, because we figured it out something like 12,000 or 13,000, but any way he kept on bidding. He had that right. He had the control of the company, the stock, and he is the superintendent of the business and all that, and he has the controlling power and can use his own judgment about it. I never interfere with him at all."

Alexander McIlvain further stated that he heard the auctioneer read the advertisement, and that he heard all he said.

When the contract of purchase was signed there was no representation of any kind as to the property made by either of the trustees, or the auctioneer or anyone else to John McIlvain. The advertisement was attached to the contract, and he had full opportunity to inform himself as to what he was signing. He is an intelligent business man; but he made no inquiry of the trustees as to the property, and he could have known by simply reading the contract that the 18 feet 9 inch strip was not included in the purchase. Under

all the authorities a party can not have a contract set aside upon the *mere* ground that he neglected to read it, if he could read, when he had a full opportunity to read it. That would be sheer heedlessness or negligence on his part against the consequences of which a Court of equity would not relieve. This would even be so in the case of an illiterate person. In the case of *Wilson* v. *Pritchett,* 99 Md. 583, which was a suit upon a contract signed by a defendant who was unable to read or write beyong signing his own name. The Court held that "the fact of the defendant's illiteracy did not relieve him from the obligation to inform himself of the contents of the contract by having it read to him by some one whose interests were not antagonistic to his own before he signed it, and he was estopped by his failure to do so from avoiding it on the ground that he was ignorant of its contents." This same principle was announced in *Spilze* v. *B. & O. R. R.,* 75 Md. 162; *Shaffer* v. *Cowden,* 88 Md. 394; *Smith* v. *Humphreys,* 104 Md. 290.

But this rule is always subject to the condition that no fraud, or material misrepresentation, or deception was practiced upon the party under the influence of which he was lead to sign the contract. *Freedley* v. *French,* 28 N. E. Rep. 272; *Wilson* v. *Pritchett, supra,* 593; *Russell* v. *Carman,* 114 Md. 25.

In *Russell* v. *Carman, supra,* a bill was filed by the grantor to set aside a deed, which conveyed certain real estate to a sister, upon the ground that its execution was secured by misrepresentation and fraud practiced upon her by her niece. She did not read the deed, but signed it under the representation that it was her sister's will. The evidence showed that she was induced to execute the deed under this misrepresentation, and the deed was stricken down.

We find nothing in the advertisement mentioned or in the circumstances attending the sale, or of the signing of the contract that would authorize the Court to set aside the sale, there being no misdescription of the property or misrepresentations made by the trustees, or the auctioneer.

But the appellant claims that it was misled by a misdescription of the property contained in the advertisement inserted by the trustees in the Baltimore Sun on or about the 15th of October, 1910. A copy of this advertisement appears in the record. It contains an accurate description of the lot by metes and bounds. John McIlvain testified that he read the whole of this advertisement, and while the head-lines stated that the lot was situated at the southeast corner of Fort avenue and Lawrence street, the body of the advertisement, qualified this, and stated that the beginning point in the description of the property was at "the southeasternmost corner of Fort avenue and Lawrence street *as now open, dedicated and used*". This can not be fairly said to be a misdescription of the property, but is one which accords substantially with the exact situation and condition. Much that we have heretofore said applies as well to this advertisement. The burden was upon the plaintiff to sustain his exceptions, and the decision must rest in a great measure upon his own testimony, which is much weakened by that of other witnesses. The decided weight of the evidence is that John McIlvain was present at the sale and heard the advertisement read and the statements made by the auctioneer as to the ground owned by the Baltimore and Ohio Railroad Company.

The Court had jurisdiction to pass the decree for the sale of the property, and we have been unable to discover any irregularities in the proceedings of which the exceptant can complain.

If John McIlvain fell into an error or misunderstanding as to the property this was due to his own fault and his own negligence and inattention. It may be that he paid too much for the property, but that is no reason, under the facts of the case, why the sale should be set aside. The orders appealed from will be affirmed.

*Orders affirmed, with costs to the appellee.*