BORING ET UX. *v.* JUNGERS ET UX.

[No. 218, September Term, 1959.]

460

*Decided May 19, 1960.*

*Motion for rehearing filed June 17, 1960, denied July 1, 1960.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*A. Frederick Taylor,* with whom were *Martin & Taylor, Paul Martin* and *Jay K. Secor* on the brief, for appellants.

*Donald C. Sponseller,* with whom were *Sponseller & Hoff* and *Stanford Hoff* on the brief, for appellees.

HAMMOND, J., delivered the opinion of the Court.

The chancellor refused Mr. and Mrs. Boring, the appellants, rescission of a deed to them and the purchase money mortgage from them, as well as an injunction against foreclosure or other enforcement of the mortgage, and they urge fraud and misrepresentation in seeking reversal.

The Borings have dealt in real estate in Carroll County from time to time. In late 1957 they sought acreage which could be developed and resold profitably for commercial and residential use. They employed Adolph Furman, a Baltimore realtor, to purchase for them a tract of land near Finksburg, which they had noticed had a long frontage on the Reisterstown-Westminster road, U. S. Route 140. The owners of the property, Mr. and Mrs. Jungers, were represented by a lady real estate agent named Shroyer and at first Furman dealt with her. A contract prepared by her was rejected by the Borings, who insisted that a new survey of the land be made and furnished them by the sellers, and that the contract contain a provision that the frontage on Route 140, which had been represented to Furman as being 1200 feet, be accessible at any point from the highway so that "the buyer

may enter from any point." The Borings say access all along the highway was essential for profitable development. A contract embodying the Boring demands was executed on February 12, 1958, by the Jungers and by Furman as the authorized agent of the Borings. It conveyed "the following described property * * * consisting of 36 acres (more or less) with approx. 1200 feet frontage on the main Westminster-Reisterstown road (Route 140) also a 32 foot right of way on Route 91 * * * in fee simple" for $33,000 of which $3,000 was to be in cash and $30,000 in a five-year purchase money mortgage bearing 6% interest payable semi-annually.

In May, the Jungers, Miss Shroyer and Furman gathered for settlement in the office of the lawyer in Westminster whom Furman, at the Borings' direction, had engaged to search and guarantee the title and prepare the deed. (The lawyer testified that, as is customary in Carroll County, he prepared the mortgage without charge to the seller, regarding himself as representing both sides although primarily the buyers.)

It is agreed that at the meeting the lawyer laid a ruler on a delineation of the outlines of the property prepared from deeds, without survey, by G. Bucher John, the surveyor requested by the Borings, and advised those gathered for the settlement that the road frontage was less than 1200 feet by some 100 feet. The Jungers and Miss Shroyer say and Furman denies, that Furman replied: "We have gone all through that and there's road frontage there enough for us * * *."

There is no doubt, however, that Mr. Jungers and Furman, after the signing of the contract and before settlement, initialed a plat Furman had caused to be prepared from deeds given him by the Jungers, which showed a road frontage of a little more than 1013 feet. Jungers says he told Furman there were not 1200 feet on the road, to which Furman answered "* * * we are not interested in that, we got enough. Both initial this plat we have here why we'll go through with it" and that this was the reason for the initialing of the plat. Furman admitted he had the plat prepared, that he initialed it, that he gave Jungers a copy and that he showed Boring the

plat before final settlement, but claimed he never knew there were less than 1200 feet on the road.

The May meeting did not produce a settlement because of a dispute between Furman and Miss Shroyer as to the division of the commissions. The lawyer then learned that the Borings, whom he had known for years, were the real purchasers, and not a holding corporation of Furman's, as he had supposed, and drew a new deed in preparation for a future settlement, which was effected in June. Present then were the Borings and the Jungers, who had not met before. The deed was read aloud by the lawyer, after which Mr. Boring read it and discovered that in it the right of way to Route 91 was described as only one rod (16½ feet), not thirty-two feet as the contract had specified. After some discussion, the Borings agreed to go through with the settlement. They say they were told by the lawyer that "everything else is right." This was not accurate because the deed stated that the description was "according to a Certificate of Survey made by George Bucher John, County Surveyor, in March, 1958" and there had been no new survey, the description being from an outline drawing prepared by John from the descriptions in deeds to the Jungers. (John had made field surveys some years before.) The lawyer testified he had not realized the description furnished him was not from a new survey; that he had made a mistake. The Borings testified they asked where the survey plat was and were told that John and the Jungers' son, who was a registered surveyor also, were working on it and would have it ready in a few days. The lawyer could not recollect any such conversation.

The description in the deed had lines 17, 18 and 19 binding on the "Easement of the State Road right-of-way (U. S. No. 140)." It may be surmised that this was accurate when the survey from which the description was prepared was made; apparently Route 140 afterwards was widened and modernized. In the process, it would appear that the Jungers' land became separated for some 307 feet from the new road which ran through the land of one Peltzer and left a pie-shaped wedge of Peltzer land—about a quarter of an acre—between Jungers' tract and the new road. Jungers seemingly

used the Peltzer land as his own without objection. The Jungers swore in their answer and in their testimony that at the settlement they told the Borings that the frontage on the road was only 700 feet and that the Borings, with this knowledge, went through with the settlement. The lawyer said no such conversation took place. He did say that he told Furman at the abortive May settlement that line 17 did not front on Route 140, that on the plat he was using (the John description plat) the letters "R/W" (right of way) appear below line 17, and he says "that's what I pointed out to him as not being on Route 140." Jungers admitted he knew that Peltzer owned the strip between his land and the new road and that the plats did not show this, but said he told Furman and, anyhow, he did not think it was important because Peltzer let him use it and he knew Peltzer would give it to him if he asked. After the institution of the pending suit, the Jungers acquired title to the Peltzer wedge and the chancellor decreed that they convey it to the Borings.

After settlement the Borings, through Furman, made various attempts to sell the land. In November, the Borings were given a survey plat by the Jungers, prepared by their son, which showed the divergence of the land from Route 140 for some 307 feet. The suit for rescission was filed in January 1959. It is argued here that relief should have been granted because of the shortage in frontage, because no survey was furnished before settlement, and because the Jungers did not own the Peltzer wedge, which the Borings were led to believe, and did believe, was sold to them.

We think the Borings cannot justly complain because the road frontage, including that of the Peltzer wedge, was some 190 feet short of 1200 feet. Passing the point that the contract said the frontage was "approx. 1200 feet"—compare *Cohen v. Numsen,* 104 Md. 676, 681, and *Brodsky v. Hull,* 196 Md. 509—we find it clear that the Borings knew before settlement that there were only a little over 1000 feet of road frontage. Furman was their agent; the evidence makes it plain that he knew the facts, and his knowledge acquired in the course of the transaction was the knowledge of his principals. *Plitt v. Kellam,* 222 Md. 383; *Devries v. Shumate,*

53 Md. 211; *Baltimore v. Whittington,* 78 Md. 231, 238; 5 Tiffany, *Real Property,* Sec. 1286 (3rd Ed.). See also *Baltimore American Insurance Co. v. Ulman,* 165 Md. 630, 638. Furthermore, Furman said that before settlement he had shown Boring the plat which revealed the extent of the shortage along the road. "A sale, though founded on the misrepresentations of the seller, cannot be for that cause wholly rescinded, if prior to the completion of the sale, the purchaser had become acquainted with the whole facts, and yet confirmed the bargain." *Gunby v. Sluter,* 44 Md. 237, 249, adopting the language of *Hilliard on Vendors,* p. 330.

In attempting to set aside an executed sale of land, the complaining buyers have a heavy burden, one they have not met in our view, because they have failed to show any loss or injury. 1 Black, *Rescission and Cancellation,* Secs. 36 and 112 (2nd Ed.). Under the decree appealed from they will acquire title to the Peltzer wedge, which will make their property bind on Route 140 and give them access from that road at any point, as they had demanded and thought they were getting. In *Cochran v. Pascault,* 54 Md. 1, 13, this Court, adopting the language of *Atlantic Delaine Co. v. James,* 94 U. S. 207, 214, 24 L. Ed. 112, 114, said what it had held before and has held since, that rescission of an executed contract for the sale of real estate, "consummated and evidenced by the most solemn instrument known to the law," requires the exertion of "* * * the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been deceived and *injured* by them." (The italicization appears in the official report of the case and shows the emphasis the Court placed on the need for injury if relief is to be granted.)

In considering whether the Borings have made fraud "clearly to appear" it must be remembered that a much higher degree of proof is required to establish a claim of fraud than to establish the allegations of a usual civil case, where a mere preponderance of the evidence decides the result. *McShane*

*v. Hazelhurst,* 50 Md. 107, is a good illustration. See, too, *Ranstead v. Allen,* 85 Md. 482, 486, in which the Court, referring to the cancellation of a formal instrument (a lease), said that it was an exercise of power fraught with much danger "unless guarded with an ever-zealous care to see that there is no uncertainty about the evidence relied on." In *Wenstrom Consolidated Dynamo & Motor Co. v. Purnell,* 75 Md. 113, 119, it is put in this wise: "* * * the *onus* is upon the plaintiff, who seeks to set aside a contract executed or partly executed, to establish the alleged fraud by clear and indubitable proof. For the court will not, as said by Judge Story, rescind the contract without the clearest proof of the fraudulent misrepresentations * * *."

In *Cox v. Tayman,* 182 Md. 74, 79, a case in which rescission, sought as to an executed sale of real estate, was denied, Judge Adams said for the Court: "In a suit to set aside a deed on the ground of fraud the alleged fraud must be established by the clearest and most satisfactory proof and if there is doubt as to the existence of the alleged fraud, relief should be denied."

We think the evidence that has been set out at some length, so that its sufficiency could be tested by the severe standards of the cases, falls short of that clearness and strength necessary to establish fraud, and that the contention of the Borings that the matters about which they complain have been shown to constitute fraud must fail.

The rule as to misrepresentation that this Court has laid down is that any misdescription of the estate or interest or of the nature and extent of the property on a material and substantial point is enough to avoid the contract. If it is to be reasonably supposed that but for the misrepresentation the contract would not have been entered into, the Court will set it aside if injury or damage has resulted. *Rayner v. Wilson,* 43 Md. 440; *Reigart v. Fisher,* 149 Md. 336; *Glendale Corp. v. Crawford,* 207 Md. 148, 158. See also *Nee v. Dillon,* 239 F. 2d 953 (D. C. Cir. applying Maryland law). In *Keating v. Price,* 58 Md. 532, the vendor did not own a quarter of an acre, out of twenty, of the land supposedly bought, but the missing portion was material to the buyer's intended use of

the property and rescission was granted. Likewise, we may assume here that the Borings would not have made or completed the purchase if they had known that over 300 feet did not bind on Route 140 but, still, they cannot prevail because the decree appealed from will cause to be vested in them the estate they purchased and they will have suffered no damage.

In *Cochran v. Pascault,* cited above, the grantors had made innocent but material express misrepresentations as to title.[1] The case started as a suit to foreclose the purchase money mortgage and a cross-bill was filed praying that the deed and mortgage be cancelled. Shortly after the cross-bill was filed (some years after the original conveyance), the grantors acquired and tendered to the buyers the title they long ago had represented they owned. The Court said at page 13 of 54 Md.: "Injury resulting from the misrepresentations, even when they are knowingly and fraudulently made, is as essential to relief in equity where rescission of an executed contract is sought, as it is in an action at law for deceit," citing with approval *Kimball v. West,* 82 U. S. (15 Wall.) 377, 21 L. Ed. 95. There the allegations relied on to set aside a contract for an executed sale of real estate were that the defendant represented to the plaintiffs that the title to the land was good, without encumbrance or adverse claim, when in truth and in fact an action for ejectment was pending for 184 acres of it against the defendant, in which judgment was afterwards rendered against him, and that the land so recovered against the defendant was the most valuable part, without which the purchase would not have been made, and that the defendant fraudulently concealed the existence of the suit and represented title to the whole to be perfect. At page 96, of 21 L. Ed. the Court said: "On the question of concealment and fraudulent representation, testimony was taken on both sides, which does not leave the matter free from doubt.

---

1. In *Gunby v. Sluter,* 44 Md. 237, 248, Judge Bartol, for the Court, said that material and substantial representations vitiate a contract, though made by mistake, if they are to the advantage of the party making them. The language of Sugden's *Vendors and Purchasers* p. 28, was adopted: "It is immaterial whether she misstated it wilfully, if she stated it falsely (Ch. 1, Sec. 2, pl. 44)."

But this is unimportant, in the view which we take of the case." The unimportance of the question of concealment and misrepresentation to decision was because, before the cause came to final hearing, the defendant purchased the outstanding and conflicting title to the 184 acres and tendered to the plaintiffs a conveyance which made their title perfect. The Supreme Court said, in affirming a dismissal of the buyer's bill: "When, therefore, it appears that at the time of the hearing the defendant is able to remedy the supposed defect in his title and, in point of fact, secures and makes good to the complainants, at his own cost, all that he conveyed to them originally, the plaintiffs must show some loss, injury or damage by the delay in perfecting the title before they can claim a rescission of the contract."

In *Cochran v. Pascault, supra,* at p. 16 of 54 Md., Sir Edward Sugden (later Lord St. Leonards) in his *Vendors and Purchasers,* Ch. 15, Sec. 4, pl. 14, was quoted thus: "* * * And a vendor who has sold a bad title, will, under a covenant for further assurance, be compellable to convey any title which he may have acquired since the conveyance, although he actually purchased such title for a valuable consideration." See also *Brewer v. Herbert,* 30 Md. 301, 314: "The authorities are clear that equity will not compel a vendee to take an imperfect or defective *title,* yet cases of high authority are to be found in which * * * equity has enforced the agreement where a perfect title can be made at the time of the decree."

Since the chancellor in his decree required the Jungers to convey the Peltzer wedge to the Borings, they will receive, as we read the record, what they bargained for and knew they were getting. There was competent and persuasive evidence that the land purchased was worth the price paid for it, and no showing that the delayed perfection of the title has caused loss or damage.

*Decree affirmed, with costs.*