## MERIT MUSIC SERVICE, INC. *v.* SONNE-BORN, ET UX., ETC.

[No. 518, September Term, 1965.]

*Decided January 17, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, OPPENHEIMER, BARNES and FINAN, JJ.

*R. Lewis Bainder* for appellant.

*Morton L. Goldner,* with whom was *Ellis Peregoff* on the brief, for appellees.

FINAN, J., delivered the opinion of the Court.

Appellant, Merit Music Service, Inc., is a Maryland corporation engaged in the business of leasing coin-operated vending and amusement machines in various locations in and around Baltimore City. Appellees, Sidney Sonneborn and Jennie Sonneborn, his wife, own and operate a tavern located on South Monroe Street in Baltimore and trade as Jen's Park Inn, hereinafter referred to as Jen's, at that location. Prior to August, 1962, appellees operated a similar business on Ridgely Street in Baltimore, which was closed during the latter part of July, 1962, due to urban renewal. For approximately five months appellees tried to find another location for their business and in November, 1962, the appellees were informed by a real estate agency that Jen's was for sale. In order to consummate the purchase of the new tavern, appellees approached the appellant for a loan of $1,500. Appellant had supplied amusement machines to appellees for a number of years at their former place of business and appellees owed appellant over $5,000 from their previous dealings.

Settlement for the purchase of the tavern took place on the evening of November 16, 1962, at Jen's. Present when settlement talks began were the seller, the appellees, Julius W. Lichter, appellees' attorney, and Lee Fine, a real estate agent for the seller. Shortly after settlement began Mr. Morris Silverberg, president of appellant, arrived. After discussions, which lasted almost half an hour, Silverberg agreed to loan appellees $1,500 provided that security was given for the loan; this much is not disputed. However the testimony is contradictory as regards the security discussed by the parties at the settlement. Mr. Lichter, appellees' attorney, testified that Silverberg requested that the appellees' prior indebtedness as well as the $1,500 loan be secured by the liquor license formerly located at appellees' previous place of business and that this was the only security agreement discussed or executed by the parties in his presence. Mr. Fine, the real estate agent and who is also an attorney, testified that in addition to the assignment of the liquor license Silverberg wanted additional security by way of a minimum guarantee from machines he was going to install in Jen's and that he believed appellees' attorney was present during this discussion. He further testified that he was not present when

the contract embodying the minimum guarantee provision was signed. Mr. Silverberg, who is also a member of the Bar of Maryland but not a practicing attorney, corroborated the testimony of Fine and further testified that after he had given the Sonneborns his check for $1,500, he telephoned his son, David Silverberg, and told him to bring to Jen's a form contract relating to the leasing of amusement and vending machines from Merit to appellees. After his son arrived with the form agreement, Morris Silverberg testified that he inserted the minimum guarantee clauses [1] in the blank spaces, after explaining them to the appellees, after which the contract was executed by the Sonneborns. It was also Silverberg's testimony that the terms of this agreement were discussed with Mr. Lichter prior to its formal execution; however, from the preponderance of the evidence, it would appear that Mr. Lichter was not present when the contract was executed. According to the testimony of appellee Jennie Sonneborn, Mr. Silverberg left after he had given the appellees his check for $1,500 and received the assignment of the liquor license; that was the only security arrangement discussed before his departure. She further testified that Silverberg returned alone to Jen's about midnight and "asked us [Sidney Sonneborn et ux.] to sign a paper he had in his, handwriting in reference to the $1500. He said, 'Just sign this.' We

---

1. "1. The Operator agrees:

"a. To install at his expense for the effective period of this lease as hereinafter stated in each space or spaces mutually agreed upon in the main room of the Proprietor's premises, the following machines:

"One Pinball Amusement Machine (at a minimum guarantee of $30.00 per week to operator) plus licence taxes. One Music Machine (at a minimum guarantee to operator of $12.00 per week) plus licence taxes, hereinafter known as 'Equipment.'"

* * *

"4. The Proprietor further agrees and guarantees that at no time shall the Operator's share be less than Forty Two Dollars ($42.00) per week, each and every week, and in the event that the proceeds to the Operator falls below the aforesaid amount, the Operator shall have the right to terminate this agreement, and all monies due him shall become payable to him immediately."

thought it was a note that he had loaned us the $1500." The appellees signed the contract without reading it and alleged that no copy of the agreement was left by Silverberg with them.

Immediately thereafter appellant installed one pinball machine and shortly thereafter a music box pursuant to the terms of the agreement. Within two weeks of the conception of the contract appellant learned that competitive equipment was installed in the appellees' premises in violation of the agreement. This violation was called to the Sonneborns' attention by letters dated December 8 an December 21, 1962. In March or April of 1963, the competitive bowling machine was removed and appellant installed its own, which according to Jennie Sonneborn was continually out of order.

Collections from the machines were started by the appellant on a weekly basis and for the first few weeks the proceeds were divided on a 50-50 basis—apparently to give the appellees an incentive. Thereafter the minimum guarantee clause was invoked and this is when controversy developed.

According to the testimony of Jennie Sonneborn the appellees were first told in the early part of 1963 that they were going to be held to a minimum guarantee and they objected. It was not until after they refused to sign collection slips, reflecting a division of the proceeds according to the minimum guarantee clause, that they allegedly became aware of the leasing contract. Periodic collections continued on a regular basis until June of 1963, after which only intermittent collections were made because, according to Mr. Silverberg, of appellees' interference.

On August 21, 1964, by letter of their counsel, the appellees ordered the appellant to remove its equipment from their premises. Two subsequent letters dated February 16, and March 30, 1965, ordered removal of the machines and as a result of this correspondence, counsel for the parties reached an agreement for the removal of appellant's equipment and disposition of the proceeds from a final collection to be made without prejudicing the rights of either party.

On July 6, 1965, Merit filed a bill of camplaint in the Circuit Court for Baltimore City alleging breach of paragraph g

of the agreement of November 16, 1962, which reads as follows:

> "During the term of this lease, or of any renewal thereof, no other electrical, manual, or mechanical coin operated equipment, machines or phonographs of any kind, nature or description shall be permitted on the premise, and in accordance with such provision the Proprietor agrees to permit no other party, parties, firm, corporation or even the Proprietor himself to install and operate any such machine or machines on the said premises during the term of this lease, or any renewal thereof. The Proprietor agrees for himself, his personal representatives, his heirs, successors and assigns, by reason of the aforementioned consideration passing to him, that a decree may be passed by any Court of Equity in which suit is brought for such purpose, enjoining him, his personal representatives, heir[s], successors and assigns from violating this covenant."

The relief prayed was an injunction restraining appellees "from permitting any electrical, * * * coin-operated equipment, machines, or phonographs of any nature or description of any operator or operators than" appellant on appellees' premises; an accounting and a monetary decree for damages. Appellees' answer denied the existence of a valid, legal and enforceable contract between the parties and in the alternative pleaded that, assuming a valid contract, the appellant breached the agreement by its failure to properly service the equipment and account for the proceeds derived therefrom as provided for in the contract. The Chancellor dismissed the bill of complaint finding that the appellees never agreed to a minimum guarantee; that the alleged contract was without consideration; that the agreement would be unconscionable if the minimum guarantee were to be enforced and the minimum guarantee clause constituted a material addition to the agreement by the appellant. From the Chancellor's order dismissing the bill of complaint, appellant has taken this appeal.

The Chancellor, sitting as a judge of the law as well as of

the facts, found that the contract between the appellant and the appellees on its face was valid despite the apparent harshness of its terms, citing *Stamatiades v. Merit Music,* 210 Md. 597, 124 A. 2d 829 (1956), a case in which the present appellant was involved in litigation regarding a contract similar to that in the case at bar.

The question now before us is whether or not the Chancellor was clearly in error (Rule 886 a) in his finding that the contract was materially altered by the appellant after its execution by the appellees. The Chancellor in his oral opinion stated: "I find as a fact that this contract was not the contract that the Sonneborns [appellees] agreed to; that the clause in dispute, namely the minimum guarantee clause, was not part of it [contract] at the time they signed it; that there has been a material addition made by the operator, [appellant] * * *."

This Court is of the opinion that the evidence in this case does not support the finding of the lower court.

There was no question in the Chancellor's mind that the appellees executed a contract, the court stating:

> "I have no doubt they both signed it. Mrs. Sonneborn identifies her signature and admits it to be her signature. Mr. Sonneborn is not so sure, but I believe this is his signature. I have no difficulty over that."

The persons who should have been in the best position to give testimony as to whether or not the contract had been altered after its execution were the appellees, but they foreclosed themselves from giving trustworthy testimony on this all important issue because, by their own admission, neither of them read the contract prior to signing it nor, according to their testimony, did they retain a copy in their possession. Mrs. Sonneborn, when asked by counsel what she thought she was signing, testified: "I imagined it was a note." Both appellees readily admitted that they did not read the written document prepared for their signature.

The date of execution of the contract was November 16, 1962. It was not until March of 1963, that their attorney obtained a photostatic copy of it. After he explained the contract to them, both appellees stated they would never have signed

a contract with such harsh terms. Mrs. Sonneborn perhaps best summed it up when replying to a question from appellant's trial attorney regarding her reactions when the contract was explained to them, stating: "When he said it was a seven year contract I said I would never sign a seven year contract under those terms, I would be foolish to sign a contract for $30 a week on a pinball machine and $12 on a music box. I didn't know what those machines would take in a week." Again, later in her testimony, she said: "I never signed a seven year contract calling for a minimum." But the fact remains she did sign a contract and furthermore, she left herself in such a position that she cannot actually say what was, or was not, in the contract for the simple reason that she did not read it, and the same applies to Mr. Sonneborn.

In the case of *Rossi v. Douglas,* 203 Md. 190, 100 A. 2d 3 (1953) wherein this Court reversed a decree of the Chancellor granting an injunction to restrain the appellant from using certain land reserved to them pursuant to a reservation in a lease agreement; Chief Judge Sobeloff, speaking for the Court, said (p. 199, 100 A. 2d 7) :

> "There is no claim here of fraud or duress or mutual mistake, and it is well established that in the absence of these features one having the capacity to understand a written document who reads it, or, without reading it or having it read to him, signs it, is bound by his signature. *Spitze v. B. & O. R. R.,* 75 Md. 162, 23 A. 307; *Columbia Paper Bag Co. v. Carr,* 116 Md. 541, 82 A. 442; *McGrath v. Peterson,* 127 Md. 412, 96 A. 551; *Western Maryland Dairy v. Brown,* 169 Md. 257, 262, 181 A. 468, 471; *Gardiner v. Gardiner,* 200 Md. 233, 88 A. 2d 481; *Ray v. Eurice, supra; Williston, Contracts,* sec. 90 A; *Restatement of Contracts,* sec. 70. Indeed Williston says that even if an illiterate executes a deed under a mistake as to its contents, he is bound both at law and in equity if he did not require it to be read to him or its object explained. This is everywhere the rule. *Williston, Contracts,* sec. 1577."

There is a qualification to the above mentioned rule which this Court recognized in *Binder v. Benson,* 225 Md. 456, 171 A. 2d 248 (1961). Judge Hammond (present Chief Judge), speaking for the Court, said (p. 461, 171 A. 2d 250) :

> "A qualification of the rule is that an apparent manifestation of assent will not operate to make a contract if the other party knows, or as a reasonable person should know, that the apparent acceptor does not intend what his words or other acts ostensibly indicate. Restatement, *Contracts,* Sec. 71(c) ; 3 Corbin, *Contracts,* Sec. 610; 17 C.J.S. *Contracts,* Sec. 143, p. 497; *Frederich v. Union Electric Light & Power Co.* (Mo.), 82 S. W. 2d 79, 86; *General Electric Supply Corp. v. Republic Construction Corp.* (Ore.), 272 P. 2d 201; *Beatty v. Donahue* (Ky.), 249 S. W. 2d 33; *Lange v. United States* (C.C.A. 4th), 120 F. 2d 886, 889."

However, there is nothing in the facts of this case to justify the application of this exception.

In the case before us there is no evidence of fraud; unless we accept the gratuitous assumption that the appellant altered the lease after its execution and to arrive at such a conclusion, one must engage in unwarranted speculation.

The agreement in question was a form type of contract, part pre-typed and part left in blank, to be filled in to suit the specific terms of a given situation. It was these terms filled in by Morris Silverberg in ink, in his handwriting, that has caused the controversy between the parties.

If Silverberg filled in the blank spaces of the contract with the very material provisions covering the duration of the contract and the minimum guarantees, after he had obtained the appellees' signatures, then the contract was null and void because there was no *concursus ad idem* concerning essential provisions of the contract. *Robert Fraley v. Null, Inc., et al.,* 244 Md. 567, 224 A. 2d 448 (1966).

Conversely, if the material provisions had been inserted in the blank spaces prior to the execution of the contract by the appellees, it was a valid contract for the law presumes that a

person knows the contents of a document that he executes and undertstands at least the literal meaning of its terms. As was said by Judge Boyd in *Smith v. Humphreys*, 104 Md. 285, 290-91, 65 A. 57, 59 (1906) :

> "Any person who comes into a Court of equity admitting that he can read, and showing that he has average intelligence, but asking the aid of the Court because he did not read a paper involved in the controversy, and was thereby imposed on, should be required to establish a very clear case before receiving the assistance of the Court in getting rid of such document. It is getting to be too common to have parties ask Courts to do what they could have done themselves, if they had exercised ordinary prudence, or, to state it in another way, to ask Courts to undo what they have done by reason of their own negligence or carelessness."

Morris Silverberg testified in effect that all insertions had been made at the time of the execution of the contract by the appellees and that a copy of the contract was left with them :

> Q. At the time of the execution, when the Sonneborns signed it was this the same kind of agreement?
> A. Yes.

His testimony was corroborated by his son, David Silverberg :

> Q. You witnessed the signatures?
> A. That's right.
> Q. Was it explained to them? What happened?
> A. My father told them that he would write the minimum into the contract and I explained—
> Mr. Peregoff : I didn't hear that.
> A. My father told them as he was filling in the contract, explained the different terms and one of them was the minimum guarantee, and he explained it to them, then I took a piece of scrap paper from somewhere and I wrote it out, giving various examples; if there was $100 in the machine and if there was may-

be $20 in the machine, how the money would be divided.

Q. When you had the discussion of a minimum guarantee were any amounts mentioned?

A. Yes.

Q. What were the amounts mentioned?

A. $30 on the pinball and $12 on the music box per week.

Q. Was that put in the contract?

A. Yes, it was.

The Chancellor also found the contract wanting in consideration. The appellees' counsel did not avail themselves of this argument in their brief and presentation to this Court; we find no merit in this defense. The contract clearly sets forth the loan of $1,500 from the appellant to the appellees as consideration and even though this loan is also evidenced by an interest bearing note, we feel that the making of this sum available to the appellees at a time when it was needed by them, an act which the appellant was under no obligation to perform, was a consideration sufficient to sustain the contract. In addition to the advance of the $1,500 there were other acts which the appellant was obliged to perform pursuant to the contract, such as providing, installing and servicing the machines. *Stamatiades v. Merit Music, supra; Hendler Creamery Co. v. Lillich,* 152 Md. 190, 136 A. 631 (1927).

The lower court was heavy in its censure, and rightfully so, of Morris Silverberg's conduct in bringing up the contract, discussing its terms and having it executed after Mr. Lichter, attorney for the appellees, had left Jen's. However, in the Court's opinion, this would not of itself have prevented a valid contract from being consummated. The lower court also scored Silverberg for violating Canon 9, entitled "Negotiations With Opposite Party," of The Canons of Professional Ethics,[2] in that

---

2. "A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel. It is incumbent upon the lawyer most particularly to avoid everything that may tend to mislead a party not represented by counsel, and he should not undertake to advise him as to the law."

he failed to notify Mr. Lichter that he intended to discuss the terms of the proposed contract and thus afford him the opportunity to participate in the contract negotiations. This conduct prompted the Chancellor to state: "He negotiated a contract which I think under the circumstances becomes highly suspect." Had such facts been committed by a practicing attorney, we may well have concluded that the foundation had been laid from which a deliberate scheme of fraudulent conduct could be adduced. However, Morris Silverberg, although a member of the Bar, was not a practicing attorney and apparently had never represented himself to the public as a member of the Bar. Also he was legitimately present in his capacity as president of the appellant, one of the parties to the contract. Therefore, this Court does not feel that the discussion of the terms of the contract with the appellees, out of the presence of their attorney, was a deliberate artifice resorted to by Silverberg to deceive the appellees or to gain a better bargaining position. The lower court was also skeptical of the fact that a part of the written insertions, covering the minimum guarantee, was inserted in the wrong place in the contract—thus creating an ambiguity. This might well lend credence to the contention of the appellant that the insertions were made in the barroom prior to the execution of the contract and under noisy and argumentative conditions. If the insertions were made later, as the Chancellor believed, would it not have been more likely that greater pains would have been taken by the appellant in filling in the blank spaces when accomplished at his own leisure?

The lower court also found the contract to be "most unconscionable," yet, harsh as it is, this type of contract is not without precedent in the "pinball" trade. In *Stamatiades, supra,* the terms of the contract were almost identical with the contract in the case at bar, except that in *Stamatiades* the life of the contract was five years instead of seven and the amount of the guarantee was $70 per week instead of $42.

The parties to the contract in the case before us were not strangers to each other. Silverberg had loaned the Sonneborns money on other occasions. They had litigated against each other, they dealt at arms length and neither was prompted by altruism. Their association was sustained by business expedi-

ency—not by mutual respect; all the more compelling reasons why the appellees should have read the contract.

Our sympathy, as did that of the lower court, runs with the appellees, yet we must not fall prey to the old maxim: "Hard cases make bad law." It is equally true that: "Hard cases must not be allowed to make bad equity any more than bad law." *Moore v. Pierson,* 71 Am. Dec. 409, 417 (Iowa 1858).

We are of the opinion that the Chancellor was clearly erroneous in his finding of fact that the provisions concerning minimum guarantees were inserted by the appellants after the signing of the contract by the appellees and accordingly, we reverse his order dismissing the bill of complaint. We further remand the case to the lower court for the granting of injunctive relief consistent with this opinion and for the assessment of damages.

> *Order reversed and remanded for injunctive relief and assessment of damages, appellees to pay the costs.*