## GINGELL, t/a THE ROCKVILLE CRANE RENTAL COMPANY *v.* BACKUS, ET AL.

[No. 168, September Term, 1966.]

84

*Decided March 21, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES and FINAN, JJ.

*Robert C. Heeney* and *William J. Rowan, III,* with whom were *Heeney, McAuliffe & McAuliffe* on the brief, for appellant.

*Edward B. Layne, Jr.,* with whom were *McInerney, Latham & Layne* on the brief, for James K. Backus, part of appellees; *Francis J. Ford* on the brief for National Union Fire Insurance Co., other appellee.

FINAN, J., delivered the opinion of the Court.

On December 20, 1962, the plaintiff-appellee, James K. Backus, a 61-year old laborer, with a fourth-grade education, sustained severe injuries to his foot and ankle, while employed by Mr. William Seltzer on construction work in Montgomery County, Maryland. The injury occurred when a bucket of cement, which was being hoisted from the ground to one of the upper floors of the building under construction, fell from a crane hook onto some steel beams lying on the ground, the steel beams in turn striking the right ankle and foot of the plaintiff. At the time of the accident, the crane was being operated by an employee of Eugene B. Gingell, trading as Rockville Crane Rental Company, the appellant.

The appellee was taken to Suburban Hospital where he remained until his discharge on December 30, 1962. Appellee's doctor estimated that he sustained a 25% permanent-partial disability of the right foot and ankle.

While in the hospital, he was visited by his employer at which time he filled out "compensation papers" which he delivered

to the employer. The National Union Fire Insurance Company, an intervening plaintiff, which is the workmen's compensation insurance carrier for the employer, has paid on behalf of the appellee $677.60 in medical expenses, $1,385.14 in temporary total disability benefits and $1,962.26 in permanent disability benefits.

On the morning of January 3, 1963, several days after the plaintiff had returned home from the hospital, he received a telephone call from a man who identified himself as Mr. Delaney, an insurance man, who indicated that he wanted to come to his home and discuss the accident with him. There is a conflict between the testimony of the plaintiff and Delaney, as to whether or not Delaney designated whom he was representing. Delaney testified that he stated that he was representing the Rockville Crane Rental Company. The plaintiff testified that Delaney's only identification as to his mission, was that "he had come to pay my bills, my hospital bills and insurance." At the time of Delaney's visit the plaintiff had no knowledge as to what his hospital or doctors' bills might be; how much his loss of earnings might amount to; or what the medical prognosis might be as to permanent disability, if any.

Delaney called the hospital from the plaintiff's home and obtained the information on the hospital bill; he endeavored to estimate the doctors' bills; and took a guess at the loss of wages. The latter was computed on the premise that the cast on the plaintiff's leg was due to be removed in about six weeks, and that thereafter he should be able to return to work.

After discussing the accident in general terms with the plaintiff, Delaney, with the plaintiff's concurrence, set up a voice recording machine and proceeded to record the question and answer dialogue between himself and the plaintiff. The recorded statement was introduced in evidence and heard by the jury.

The plaintiff had a friend who roomed with him named Mr. Gaiters sitting in the kitchen, where, with the door ajar, he was in a position to overhear the conversation between the plaintiff and Delaney. Before the interview was over, Gaiters came into the same room and sat with the plaintiff and Delaney. Gaiters also witnessed the release. At the time of the

trial, Gaiters was out of the State and apparently unavailable as a witness.

While Delaney was writing out the drafts he "handed the blank copy of the release to Mr. Backus to read." Delaney called his supervisor and received approval of the settlement. He then filled in the figures in the release and the name of the defendant and instructed the plaintiff to sign it, which the plaintiff did. Delaney left the checks with the plaintiff. "One check covered the Suburban Hospital bill, and the other was for his loss of wages, and Dr. Radice's bill; and then I think I threw in two hundred or three hundred extra."

The release had printed on its face, in type larger than the print composing the body of the release, "CAUTION: READ BEFORE SIGNING." The plaintiff testified in response to the question: "Did you read the paper? A. I sketched over it. My eye sight is not too good, and I did not have no glasses. Q. You didn't actually read it, then, is that right? A. I looked at it and went on signing it, and he took it.

On June 11, 1964, the plaintiff filed a declaration bringing suit against the defendant for damages for personal injuries sustained as a result of the negligent operation of the crane by defendant's employee, as a result of which the plaintiff was permanently injured.

On July 17, 1964, the defendant filed a copy of the release, which had been obtained by Mr. Delaney, as a defense in bar of the plaintiff's suit, and requested summary judgment on behalf of the defendant which was denied. The case was tried before a jury on October 20, 1965. At the close of the case, defendant moved for a directed verdict on the basis of the legal effect of the release and the alleged contributory negligence of the plaintiff which was also denied by the court. The jury returned a verdict in favor of the appellee in the amount of ten thousand dollars ($10,000); after judgment was rendered on the verdict, the appellant took this appeal.

The sole question before this Court is: Should the trial court have directed a verdict in favor of the defendant on the grounds that the plaintiff failed to produce legally sufficient evidence that the release was void because it was procured by fraud, duress or imposition amounting to fraud?

The Court is of the opinion that the trial court was in error in refusing to grant the defendant's motion for a directed verdict. We believe that the release dated January 3, 1963 and executed by Backus, the plaintiff (appellee), in favor of the defendant (appellant) for a consideration of $1,133.23 was a valid instrument which carried the full force and legal effect of releasing the appellant from liability.

The result reached by this Court in this case is not a happy one. The respective bargaining abilities of the plaintiff and the insurance adjuster, representing the defendant, were disproportionate—the advantages cast by experience and expertise being in favor of the defendant. However, this dominance of knowledge and of bargaining position does not *per se* spell out fraud, misrepresentation, duress or non-disclosure. Cf. *Merit Music Service, Inc. v. Sonneborn*, 245 Md. 213, 225 A. 2d 470, 475-76 (1967). Nor do the facts in this case raise these vices to a level sufficient to vitiate the legal effect of the release.

The general principle of law applicable to the case at bar is set forth in *Spitze v. B. & O. R. R. Co.*, 75 Md. 162, 23 A. 307 (1892). This was an action brought to recover damages for personal injuries received while the plaintiff was in the service of the defendant Railroad Company. This occurred before the advent of Workmen's Compensation Laws, at a time when the employee could successfully maintain an action against the employer upon proof of negligence. The plaintiff, after receiving a total of $94.50 in benefits, had executed releases in favor of the Railroad Company. In the trial of the personal injury case the releases were pleaded as a defense in bar of recovery. The plaintiff, endeavoring to set aside the releases, contended that he could not read English and that the releases had not been read to him. He also alleged that a supervisor had offered him another position with the Railroad at the same wage he was receiving prior to the injury. The plaintiff further contended that he made no inquiry of the person who brought the releases to him as to what the papers were, nor did he inform him that he could not read English and that he signed the papers as requested without knowledge of what they contained. The evidence showed that he had been a resident of this country for 24 years. This Court, in affirming the action of the lower

court in upholding the releases as a valid defense, speaking through Judge McSherry, said at pp. 170-71:

> "There is no pretense that they concealed anything from him which they were bound to communicate, or that they practised any imposition or deception upon him. There is nothing to indicate bad faith on their part, and nothing to show that they knew or suspected he did not fully understand the import and effect of the papers he signed. He gave no intimation that he was ignorant of what he was doing, and the attending circumstances, as disclosed, imposed no duty upon these agents and officers to enter into explanations with reference to a subject which, from his silence and his conduct, they were justified in assuming he thoroughly understood. It was in his power to inform himself as to the contents of the releases before he signed them. *The testimony proves, not fraud on the part of the defendant, but carelessness on the part of the plaintiff*; and it would lead to startling results if a person who executes, without coercion or undue persuasion, a solemn release under seal, can subsequently impeach it on the ground of his own carelessness, though at the very time of its execution, he might, had he seen fit, have advised himself fully as to the nature and legal effect of the act he was doing. He cannot, under these circumstances, be heard to complain that an imposition was practised upon him. *He cannot invoke his own heedlessness to impeach his solemn release, and then call that heedlessness some one else's fraud. If he did not know what he was signing, it was his plain duty to inquire."* (Emphasis supplied.)

The burden of proof required of the plaintiff in an action at law, attacking the validity of a release for the purpose of setting it aside, is greater than the burden of proof by a preponderance of the evidence required to prove the negligence of the defendant. This Court recognized this in the case of *Dairy Corporation v. Brown*, 169 Md. 257, 181 A. 468 (1935), stating at p. 262:

" 'It has been more than once held that it is error to submit a question of fraud to the jury upon slight parol evidence to overturn a written instrument. *The evidence of fraud must be clear, precise, and indubitable; otherwise it should be withdrawn from the jury.'* Aetna Casualty & Surety Co. v. State, use of Hendricks, 162 Md. 49, 57, 158 A. 45." (Emphasis supplied.)

*Hammond v. N. Y., P. & N. R. R. Co.,* 128 Md. 442, 448, 97 A. 1011, 1012 (1916).

The above standard of proof required for the impeachment of a release in a court of law approaches that degree of proof required in equity to set aside a contract for fraud. There is no logical reason why the burden of proof required to void a contract in equity should be any greater than the burden of proof required for the impeachment of a release in a court of law. Whether the release is rescinded by a court of equity for fraud or fraud is pleaded to bar its legal effect as satisfaction of the plaintiff's claim in a court of law, the result is the same. In either situation the release is vitiated and consequently cannot defeat a recovery in a subsequent or contemporaneous law action. Following the logic of this premise, we feel that *Gue v. Mitchell,* 240 Md. 357, 214 A 2d 319 (1965) (an equity case), is illustrative of the arduous burden of proof required of the party attacking the validity of the instrument.

In *Gue* this Court, speaking through Judge Marbury, said at p. 363:

"In many other cases this Court has asserted that this extraordinary remedy of nullifying contracts should not be granted except in unusual cases, and that a much higher degree of proof is required than in the ordinary civil case where a decision is based upon a mere preponderance of evidence. *Boring v. Jungers,* 222 Md. 458, 160 A. 2d 780; *Schmidt v. Millhauser,* 212 Md. 585, 130 A. 2d 572; *Cox v. Tayman,* 182 Md. 74, 32 A. 2d 368; *McShane v. Hazelhurst,* 50 Md. 107."

In the case at bar the plaintiff has not only failed to meet

this stringent burden of proof, but on the contrary has failed to present any legally sufficient evidence of fraud.

The two cases relied upon by the plaintiff, *Dairy Corporation v. Brown, supra,* and *Yellow Cab Co. v. Bradin,* 172 Md. 388, 191 A. 717 (1937), are readily distinguishable from the case at bar. In *Dairy Corporation,* the representative of a taxicab company procured the release, which was subsequently under attack in a personal injury case, from the injured passenger at Mercy Hospital an hour and one-half to two hours after the accident had happened. The Court, in its characterization of the release, referred to it as a "midnight release" and concluded after reviewing all the facts that "there was legally sufficient evidence that she [the passenger] was hurried into signing a release without an opportunity to appreciate and understand the nature, effect, and consequences of her act, * * *." (at p. 264.)

In the case at bar, the insurance adjuster, Delaney, did not contact the plaintiff until approximately two weeks after the accident had occurred and after he had returned from the hospital to his home. The discussion of the accident and the attendant release was held in a quiet, familiar atmosphere of the plaintiff's abode. In *Dairy Corporation,* the accident had occurred at 4:00 a.m. The passenger had been rendered unconscious by the accident and had been rushed to the hospital. The attending physician said: "She was rather excited, but not unduly so." The release was obtained in the early hours of the same morning for a nominal consideration.

In *Yellow Cab,* the release was set aside because the insurance adjuster who obtained the release from a passenger in the Yellow Cab, failed to disclose the very important fact that he also represented a second cab company, which was a joint tort feasor, and the court construed this to be a fraudulent imposition upon the releasing party. Again, the distinction between this case and the case at bar is self-evident.

The plaintiff would have us believe that the gravamen of the fraud perpetrated upon the appellee was not the plaintiff's failure to read the release or any alleged inadequacy of consideration, but Delaney's alleged failure to disclose the principal that he represented, which under the circumstances led the plain-

tiff to conclude that he was dealing with a workmen's compensation insurance company rather than a public liability insurance representative.

It should be borne in mind that there was no conflict of interest existing in the instant case as there was in *Yellow Cab Co., supra,* wherein the insurance adjuster was wearing two hats. Also, in the instant case there was no fiduciary or confidential relationship existing between the plaintiff and Delaney which would have required a disclosure in order to avoid any breach of trust. There is no testimony in the case, or reasonable inference to be deduced from any testimony, that an explanation as to Delaney's representation or the disclosure of his principal was ever requested. The parties were dealing at arm's length and there was no confidential relationship involved. The release stated on its face that the Rockville Crane Rental Company, 233 East Montgomery Avenue, Rockville, Maryland, was the party to be released. The plaintiff certainly knew that this was not the name of his employer, as he had been working for Mr. William Seltzer for approximately 12 years and had previously, while in the hospital, filled out workmen's compensation papers and delivered them to Mr. Seltzer's chauffeur. Some inquiry on his part should readily have brought the entire matter into focus for him.

The fact that Delaney, the law-student-insurance adjuster, was far more knowledgeable than the fourth-grade-educated, 61-year old laborer, is self-evident and excites compassion, but at the risk of being overly repetitious, we repeat, they were dealing at arm's length with each other. See *Merit Music Service, Inc. v. Sonneborn, supra.*

This is simply another case in which the untutored, but literate, litigant did not make reasonable use of his intellectual attainments, meager though they might have been, but which nonetheless were at hand and available for use, and now asks the courts to undo the harm he has brought upon himself. *Spitze v. B. & O. R. R. Co., supra.* Accord, *Merit Music Service, Inc. v. Sonneborn, supra,* pp. 221-222, 225 A. 2d 474-75, and *Smith v. Humphreys,* 104 Md. 285, 290-91, 65 A. 2d 57, 59 (1906).

*Judgment reversed, with costs.*